UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF INDIANA
Terre Haute Division

| | | |
|---|---|---|
| RANDALL TODD ROYER,<br>SEIFULLAH CHAPMAN, and<br>SABRI BENKAHLA,<br>    Plaintiffs,[1] | : : : : : | |
| v. | : : | Civil No. |
| B.R. JETT,<br>PAUL McNULTY,<br>UNKNOWN EMPLOYEES OF THE<br>CORRECTIONAL PROGRAMS<br>DIVISION OF THE FEDERAL<br>BUREAU OF PRISONS,<br>LES SMITH,<br>T.R. HENRY,<br>S. JULIAN,<br>T. COLEMAN, and<br>AGENT GRASS, individually<br>and in their official<br>capacities,<br>    Defendants.[2] | : : : : : : : : : : : : | Jury Trial Demanded<br><br>**2 : 09 -cv- 0 0 1 1 WTL-DML** |

CIVIL COMPLAINT AND PETITION
FOR WRIT OF HABEAS CORPUS

Plaintiffs Randall Todd Royer, Seifullah Chapman, and Sabri Benkahla, for their petition  for writ of habeas corpus and their complaint against B.R. Jett, Paul McNulty, unknown employees of the Correctional Programs Division of the Federal Bureau of Prisons ("BOP"), Les Smith, T.R. Henry, S. Julian, T. Coleman, and Agent Grass, allege as follows:

### Jurisdiction and Venue

1. This Court has jurisdiction over this action under 28

---

[1] This is a mixed complaint, containing both habeas claims and _Bivens_ claims. Although the individuals who brought this action are actually both "petitioners" and "plaintiffs," they are referred to herein as "plaintiffs" for convenience.

[2] Inasmuch as Jett is the Warden having custody of Plaintiffs, he is sued in his official capacity for the habeas claims. He and the other defendants are sued individually for the _Bivens_ claims. All defendants are sued under the APA in their official capacity.

U.S.C. § 2241 and 28 U.S.C. § 1331. The matters in controversy arise under the U.S. Constitution and 5 U.S.C. § 701 et seq.

2. Venue properly lies in this district pursuant to 28 U.S.C. § 2241 and 28 U.S.C. § 1391(b)(2) because Plaintiffs are incarcerated in the Federal Correctional Institution in Terre Haute, Indiana ("FCI Terre Haute"), which is located within the Southern District of Indiana, and because events giving rise to this cause of action occurred in FCI Terre Haute.

## Parties [3]

3. Plaintiffs Royer, Chapman, and Benkahla are and were, at all times relevant hereto, prisoners in the custody of the BOP. Plaintiffs are currently incarcerated at FCI Terre Haute.

4. Defendant B.R. Jett is and was, at all times relevant hereto, Warden of FCI Terre Haute. Defendant directly supervises the Communications Management Unit ("CMU") at FCI Terre Haute, in which Plaintiffs are confined. He manages the day-to-day operations, and executes, and helps set, its policies.

5. Defendant Paul McNulty was, at all times relevant hereto, Deputy U.S. Attorney General. Defendant played a key role in the conception of the CMU, as well as in setting and executing its policies, and in selecting Plaintiffs for confinement in the CMU.

6. The unknown employees of the Correctional Programs Division of the BOP[4] help   set and execute the policies of the CMU, and helped select Plaintiffs for confinement therein.

[3] Except as otherwise noted, the actions of Defendants Jett, Henry, Julian, Coleman, and Grass took place in Terre Haute, Indiana; the actions of Defendants McNulty and the unknown employees of the Correctional Programs Division took place in Washington, D.C.; and the actions of Defendant Smith took place in West Virginia.

[4] The names of the employees involved are unknown to Plaintiffs at this time, but will be added after discovery.

7. Defendant Les Smith was, at all times relevant hereto, an official with the Intelligence Section of the BOP. Defendant helps set and execute the policies of the CMU.

8. Defendant T.R. Henry was the first Unit Manager of the CMU. He helped set and execute the policies of the CMU.

9. Defendant S. Julian is the current Unit Manager of the CMU. Defendant helps set and execute the policies of the CMU.

10. Defendant T. Coleman is an Intelligence Research Specialist for the BOP and is currently assigned to the CMU. He helps set and execute the policies of the CMU.

11. Defendant Agent Grass is an agent of the Federal Bureau of Investigation assigned to the CMU. He assists Defendant Coleman in executing the policies of the CMU.

## Previous Lawsuits by Plaintiffs

12. Plaintiffs have filed no other lawsuits dealing with the same facts involved in this action or otherwise relating to their imprisonment.

## Exhaustion of Administrative Remedies

13. Plaintiffs have exhausted their available administrative remedies regarding the issues presented herein.

## Facts

14. Plaintiff Royer was convicted in January 2004 in the Eastern District of Virginia and sentenced to twenty years imprisonment.

15. The BOP scored Plaintiff Royer as a medium security inmate and designated him in FCI Allenwood, a medium security prison located in White Deer, Pennsylvania. He was housed at FCI Allenwood from about August 2004 to December 2006, with some

3

periods spent in various county jails. The BOP has since rescored Plaintiff as a low security inmate. He has had a clean conduct record for over three and a half years. In December 2006, he was transferred to FCI Terre Haute and confined in the CMU.

16. Plaintiff Chapman was convicted in February 2004 in the Eastern District of Virginia and sentenced, on remand, to sixty-five years imprisonment.

17. The BOP scored Plaintiff Chapman as a low security inmate but applied a "management variable" to him because of sentence length. He was designated to USP Big Sandy, located in Big Sandy, Kentucky, and he arrived there in August 2004. In May 2007 he was transferred to FCI Terre Haute and confined in the CMU.

18. Plaintiff Benkahla was convicted in the Eastern District of Virginia in February 2007 and sentenced to ten years of imprisonment.

19. The BOP scored Plaintiff Benkahla as a minimum security inmate. He has never received an incident report. In October 2007 he arrived at FCI Terre Haute and was confined in the CMU.

20. In a written memorandum, the federal district court judge who sentenced Plaintiff Benkahla stated:

> Sabri Benkahla is not a terrorist. He does not share the same characteristics or the conduct of a terrorist, and in turn he does not share the same likelihood of recidivism, the difficulty of rehabilitation, or the need for incapacitation... Defendant has not committed any other criminal acts and there is no reason to believe he would ever commit another crime after his release from imprisonment. Defendant has engaged in model citizenry, receiving a Master's Degree from The Johns Hopkins University, volunteering as a national elections officer in local, state, and national elections. It is clear that, in the case of the instant defendant, his likelihood of ever committing another crime is infinitesimal...

In fact, the Court received more letters on Defendant's behalf than any other defendant in twenty-five years, all attesting to his honor, integrity, moral character, opposition to extremism, and devotion to civic duty.

21. In a letter to Plaintiff Benkahla's sentencing judge, Congressman James Moran of Virginia wrote in part:

I have known the Benkahla family for close to twenty years. They are good citizens who care about this country, admire and constructively participate in the political process... Always active in local politics...he believed everyone had a civic duty to vote and spent considerable energies educating others on their voting rights...It is my understanding that his interest in international relations stemmed from a desire to assist the United States Government in foreign affairs. To my knowledge, Mr. Ben Kahla has been an upstanding and productive member of society.

22. On April 3, 2006, pursuant to the Administrative Procedures Act, the BOP announced a proposed new regulation titled "Limited Communication for Terrorist Inmates." The regulation would have instituted a regime of severe sanctions on inmates who, under the new policy, would be designated by the BOP as "terrorists." The proposed regulations included limits on those inmates' telephone use, visitation, and use of the mail, relative to ordinary inmates in the federal system. The proposal drew strong objections from a wide range of civil liberties groups and was never officially adopted.

23. In or about Summer or Fall of 2006, Defendant McNulty initiated the creation of the CMU and helped formulate the guidelines and policies by which it would operate.

24. In or about Summer or Fall of 2006, Defendant McNulty and Defendants unknown employees of the Correctional Programs Division determined the extent to which the communications ability of inmates confined to the CMU would be restricted

relative to the communication ability of ordinary federal inmates; that CMU inmates would be confined in a housing unit sealed off from the rest of the prison and the resources ordinary inmates enjoy; and that CMU inmates would incur other restrictions to various conditions of their confinement.

25. In or about Summer or Fall of 2006, Defendant McNulty and Defendants unknown employees of the Correctional Programs Division determined that federal inmates would be confined to the CMU, and incur its attendant significant and atypical hardships, without a hearing, and with no meaningful opportunity to be released from the CMU for the duration of their sentence.

26. In or about Summer or Fall of 2006, Defendant McNulty and Defendants unknown employees of the Correctional Programs Division determined that inmates would be selected for confinement to the CMU on the basis of their religious, ideo-logical, or political beliefs and ethnicity.

27. In or about Summer or Fall of 2006, Defendant McNulty, Defendants unknown employees of the Correctional Programs Division, Defendent Smith, Defendent Jett, and Defendent Henry determined that the CMU would be operated in a manner that exceeded or was unsupported by federal regulatory authority.

28. In or about Summer or Fall of 2006, Defendant McNulty and Defendants unknown employees of the Correctional Programs Division determined that the Department of Justice or BOP would not seek the adoption of new federal regulations that would provide regulatory authority for the operation of the CMU.

29. In or about Summer or Fall of 2006, Defendant McNulty and Defendants unknown employees of the Correctional Programs Division selected Plaintiff Royer and Plaintiff Chapman for confinement in the CMU, on the basis of their religious, ideological, or political beliefs, with the intent of imposing atypical, significant hardship upon Plaintiff Royer and Plaintiff Chapman, intending that they would not receive a hearing regarding their confinement in the CMU, and that they would be confined in the CMU for the duration of their sentence.

30. In or about Summer of 2007, Defendants unknown employees of the Correctional Programs Division selected Plaintiff Benkahla for confinement in the CMU, on the basis of his religious, ideological, or political beliefs, with the intent of imposing atypical, significant harship upon him, intending that he would not receive a hearing regarding his confinement in the CMU, and that he would be confined in the CMU for the duration of his sentence.

31. In November 2006, Defendants McNulty and Defendants unknown employees of the Correctional Programs Division directed Defendant Jett to prepare D-Unit, the former death row at FCI Terre Haute -- formally known as the Special Confinement Unit ("SCU") -- for the imminent arrival of the first inmates to be confined in the newly-christened CMU.

32. On December 11, 2006, the BOP transferred Plaintiff Royer and fifteen other prisoners -- all but two of them Muslims -- from facilities of various security levels around the country to FCI Tere Haute and confined them in the CMU.

33. On or about December 20, Defendant Henry completed drafting guidelines and policies for the operation of the CMU, described in more detail below. Defendant Henry backdated the document to November 30, 2006, and Defendant Jett signed it.

34. Defendant Henry composed the guidelines and policies for the operation of the CMU on the basis of directives from Defendant McNulty, Defendant unknown employees of the Correctional Programs Division, and Defendant Jett, along with his own input.

35. The CMU is completely sealed off from the rest of FCI Terre Haute; CMU inmates are not permitted to have any contact with non-CMU inmates, or to use the facilities or resources that other inmates do, aside from very restricted, rare medical appointments, with extraordinary measures taken to isolate the CMU inmates.

36. In the CMU, outgoing and incoming inmate mail is electronically scanned and analyzed, a process which delays delivery by days, sometimes weeks. CMU inmates receive only one 15-minute call per week, compared to 300 minutes of telephone time ordinary inmates receive. Visits in the CMU are for just two hours, just twice a month, on business days only, and are restricted to non-contact only; the general population -- and, as described more fully below, inmates in other types of restricted status -- receives weekly or biweekly all-day contact visits on weekends and holidays. Calls and visits must be conducted in English except by prior arrangement; speaking in another language without prior approval will result in termination of the call or visit and possible disciplinary action -- consequences not faced by ordinary inmates.

37 . While inmates are allowed out of their cells, they are not permitted to leave the housing unit. Steel slats obscure the view from the windows. Recreation takes place in steel cages.

38 . The BOP issues Program Statements and Institutional Supplements purporting to interpret agency regulations promulgated pursuant to the Administrative Procedures Act and codified in the Code of Federal Regulations ("CFR").

39 . The Institutional Supplement composed by Defendant Henry with input from Defendant McNulty, Defendants unknown employees of the Correctional Programs Division, and Defendant Jett, and signed by Defendant Jett, referenced in ¶¶ 32-33, supra, and hereinafter the "CMU Institutional Supplement," states in part:

> All national policies apply to the administration of D-Unit except as otherwise modified in this supplement as necessary to effect the unit's mission of increased monitoring of communications, and pursuant to the Warden's authority to make the necessary changes to protect the safety, security, and good order of the facility, and to protect the public.

(emphasis supplied.)

40 . Defendant Henry, Defendant Jett, and Defendants unknown employees of the Correctional Programs Division intended that the CMU Institutional Supplement would purport to be an interpretation of agency regulations contained in 28 C.F.R. § 541.10 et seq., titled "Inmate Discipline and Special Housing Units." This regulation provides that inmates shall be placed in administrative housing only under certain conditions and only after certain procedures have been followed. One such procedure, but not the only procedure, is a hearing attended by the inmate to determine whether confinement in administrative housing is warranted. The

regulation also provides that an inmate's confinement in administrative confinement shall not be of indefinite duration.

41. Defendant Jett has classified the CMU as a "control unit" in his response to Plaintiff Royer's administrative remedy request. Subpart D of 28 C.F.R. Part 541 sets forth the BOP's regulations with respect to control units. The regulations provide, _inter alia_, that the BOP "shall provide a hearing to an inmate recommended for placement in a control unit," and that staff must notify an inmate of his "projected duration of confinement in the control unit." The regulation further states that "[a]n inmate may not be considered [for confinement in a control unit] solely on the nature of the crime which resulted in that inmate's incarceration," that is, in BOP parlance, on the basis of his offense conduct.

42. Defendant  McNulty and Defendants unnknown employees of the Correctional Programs Division did not comport with federal regulations governing administrative housing  or control units when they recommended or approved the confinement in the CMU of Plaintiff Royer, Plaintiff Chapman, and Plaintiff Benkahla. Each plaintiff was notified that he was confined in the CMU solely on the basis of his offense conduct. None have received hearings to determine whether confinement in the CMU is appropriate. CMU staff, including Defendant Henry, have stated that Plaintiffs' confinement in the CMU is of indefinite  duration.

43. While Defendant Jett has variously categorized the CMU as a control unit or a type of administrative detention unit, if

it be determined that the CMU is neither of these, then it is some new type of special unit without a regulatory basis for its existence.

44. The BOP is subject to regulations that govern the amount and manner of communication provided to an inmate, as well as procedures that must be followed before an inmate's communication may be curtailed. Defendants Jett, Henry, Grass, Defendant Julian, and Defendant Coleman flout these regulations in their operation of the CMU. For example, an inmate's visitation may be restricted only in connection with a violation of the disciplinary code. Also, Defendant Jett is required to establish visiting hours on weekends and holidays, whereas he permits visits for CMU inmates like the Plaintiffs only on weekdays, and not on holidays. Complicit in Defendant Jett's failure to implement these regulations are Defendant McNulty, Defendants unknown employees of the Correctional Programs Division, and Defendant Les Smith, inasmuch as these defendants establish procedures and issue directives to the others who implement them.

45. The BOP is subject to regulations that govern other aspects of confinement besides those related to due process or communication; Defendant Jett, Defendant Henry, and Defendant Julian flout these regulations as well. For example, Defendant Jett is required to provide a work assignment for each inmate, including the opportunity to work in Federal Prison Industries (FPI); there are not enough work assignments for each CMU inmate, and there are no FPI jobs at all. He is also required to provide vocational training and college credit courses, but he does not.

46. Defendant Jett and Defendant Henry have written in various letters to inmates and administrative remedy responses, using identical language:

> Your communication by these methods [i.e., telephone use, written correspondence, and visiting] may be limited as necessary to allow effective monitoring. Your general conditions of confinement in this unit may also be restricted as necessary to provide greater management of your communications.

47. Except for brief periods of administrative or disciplinary detention, Plaintiff Royer was a member of the general inmate population from the time of his arrest in June 2003 to his December 2006 transfer to FCI Terre Haute and confinement in the CMU, both in county jails and in FCI Allenwood. Plaintiff Chapman was likewise a member of the general population at USP Big Sandy; there, he was never placed in disciplinary or administrative detention. Plaintiff Benkahla was free on bond, and was designated to FCI Terre Haute when he was taken into custody.

48. When Plaintiff Royer and Plaintiff Chapman were removed from the general population and confined in the CMU, they suffered a significant change for the worse in their conditions of confinement. When Plaintiff Behkahla was placed in the CMU, he became subjected to hardship that the ordinary inmates in the federal system are not subjected to. Indeed, the conditions of confinement in the CMU are in some respects equal to or harsher than those experienced by inmates in the most severe units and programs operated by the BOP: programs like the Special Housing Units (SHU); Special Administrative Measures (SAMs); the ADX, or Supermax facility in Colorado; and control units. The conditions of confine-

12

ment described infra present Plaintiffs with atypical and significant hardship in relation to the ordinary incidents of prison life.

49. For example, as noted, when it comes to the process by which inmates are placed in these programs and units, the SHU, control units, ADX, and SAMs are all governed by codified federal regulations. If, arguendo, the CMU is not a SHU or control unit, then there is no codified, non-arbitrary process of confining inmates in the CMU. Moreover, of all the harsh programs mentioned, only inmates in the CMU and SAMs are not afforded intitial or regular hearings to determine whether application of the program is warranted. Of these harsh measures, only the CMU and SAMs may be levied on an inmate on the basis of offense conduct alone. And of these harsh programs, only the CMU is intended to apply to an inmate for the entire duration of his sentence.

50. When it comes to communication, like all ordinary inmates, when Plaintiff Royer and Plaintiff Chapman were in the general population, they enjoyed contact visits with their wives and children, lasting all day long, on weekends and holidays; inmates in the SHU are afforded the exact same, as are SAMs inmates in the general population. Now, in the CMU, Plaintiffs are limited -- just like ADX and control unit inmates -- to non-contact visits. Inmates at ADX, however, are permitted thirty hours of visits per month, to CMU inmates' four hours per month. [5]

---

[5] Moreover, since Defendants have confined Plaintiffs at a much greater distance from their homes than the distance BOP policy recommends, their families travel many miles, and at exorbitant expense, to visit them.

51. As for telephone use, SAMs and SHU inmates may use the telephone in the evening and on weekends; CMU inmates may use the phone only during business hours, making communication with employed family members and school-aged children difficult. SAMs is a flexible program and inmates subject to it may be permitted the same 300 minutes per month that most general population inmates have; CMU inmates are permitted only one fifteen minute call per week.

52. When Plaintiff Royer and Plaintiff Chapman were in the general population, they had the opportunity, like ordinary inmates, to work in the prison factory, to run outdoors on a track, to worship and make use of religious resources for several hours a week in a chapel, to learn a trade and earn a license, and to earn college credits; SAMs inmates in the general population have the same opportunities. Now that they are confined in the CMU, Plaintiffs -- just like inmates at ADX, the SHU, and control units -- have no such opportunities.

53. Defendants Coleman and Grass administer the restrictions on Plaintiffs' telephone use by ensuring that they use the telephone no more than 15 minutes per week during business hours. They do this at the direction of Defendant Jett, Defendant Smith, and Defendants unknown employees of the Correctional Programs Division.

54. Defendant Jett administers the restrictions on Plaintiffs' visitation by ensuring that they conduct visits only through glass, audible only through a telephone, only on business days, and for only four hours a month. He does this with the assistance of Defendant Coleman, Defendant Julian, Defendant Grass,

14

and Henry, and at the direction of, and/or with the knowledge and acquiescence of, Defendants McNulty, unknown employees of the Correctional Programs Division, and Smith.

55. Defendants Jett and unknown employees of the Correctional Programs Division are perpetuating Plaintiffs' confinement in the CMU with its attendant restrictions by refusing to order Plaintiffs' release to the general population, by denying them a hearing, and by failing to set forth any criteria or steps they might take to earn their discharge from the CMU. Defendants Smith, Coleman, and Grass participate in Plaintiffs' continued confinement in the CMU by failing to recommend their discharge from the unit, while their recommendation would effectuate or tend to effectuate Plaintiffs' discharge from the unit and relief from its harsh, atypical, punitive restrictions.

56. Restricting Plaintiffs' telephone calls to one 15-minute call per week made only during business hours is not rationally related to the defendants' stated goal of monitoring their communication. There is no reason why their calls need to be restricted in order to monitor them. The BOP already records every call made by the inmates in its custody, and it live-monitors a significant number of them. In fact, Plaintiff Chapman was permitted 300 min. per month in general population, under an arrangement wherein the calls were pre-arranged to facilitate live-monitoring by one BOP SIS Officer Tabari. No alleged harm arose from this arrangement necessitating a restriction of tele-phone time.

15

57. Preventing Plaintiffs from having physical contact with their families is not rationally related to the goal of communications monitoring. Preventing drugs and weapons from entering an institution is the usual purpose of disallowing contact visits. Plaintiffs Royer and Chapman received contact visits both in the county jail and in their respective BOP facilities for years, and Defendants have alleged no harm that resulted that would justify a need to disallow physical contact with their families.

58. With respect to contact visits, FCI Terre Haute staff have installed cameras and hypersensitive microphones throughout the CMU, including in areas which staff have advised would be suitable for contact visits should Defendants Jett, Smith, Coleman, Grass, and unknown employees of the Correctional Programs Division allow them and/or recommend their allowance. FCI Terre Haute has the facilities to process visitors for contact visits. Staff would need no additional training, and no extra officers would be necessary since an officer must be present for the non-contact visits anyway; hence, staff would not be substantially affected.

59. Plaintiffs are willing to speak in english only during calls and visits, and schedule their calls ahead of time, as part of an alternative to the harsh restrictions they now face.

60. Plaintiffs Chapman and Benkahla were determined not to pose harm to the community and released by federal judges pending

trial. Defendants can point to no harm that resulted to the safety and security of the community stemming from the lack of restrictions on these Plaintiffs' communications while they were free on bond that would suggest or give rise to a government need to restrict their communications now.

61. Even if restricting the amount of Plaintiffs' calls and disallowing physical contact with their families is somehow rationally related to the goal of monitoring their communication, it is an exaggerated response to that concern.

62. Plaintiffs, like nearly all CMU inmates, are practicing Muslims, and the BOP, and individually Defendants unknown employees of the Correctional Programs Division, Defendant Paul McNulty, and Defendant Les Smith, consider their instant offenses to have been motivated by their religious and/or political beliefs. Those few CMU inmates who are not Muslims are allegedly affiliated with unpopular political or ideological causes.

63. There are thousands of inmates in the federal prison system who are religiously or politically "neutral," or whose crimes were impelled by traditional criminal motives, like vice or greed: inmates convicted of crimes like kidnaping, sex offenses, gang activity, organized crime, drug distribution, and murder. These inmates present a need for communication monitoring equal to or greater than Plaintiffs, yet they are not confined to the CMU, and they make telephone calls and have contact visits with their families like ordinary inmates.

64. There is no penalogical justification for the CMU inmate population's disproportionate ratio of religiously or ideologically affiliated inmates to inmates not so affiliated. Defendants are

17

literally operating the United States' only political or ideological prison. Plaintiffs were not placed in the CMU and do not remain in the CMU because of their alleged criminal actions in themselves; rather, they were singled out on the basis of their perceived religious, ideological, and/or political beliefs.

65. The Code of Federal Regulations provides that:

Bureau staff shall not discriminate against inmates on the basis of...religion...or political belief. This includes the making of administrative decisions and providing access to work, housing, and programs.

### Count One: Habeas Claims

66. Respondent/Plaintiff Warden's confinement of Petitioners/ Plaintiffs is illegal and contrary to law, as:

(a) the CMU was created, and its attendant harsh, punitive, atypical conditions of confinement imposed, without statutory, regulatory, or policy authority, and without notice and opportunity for public comment, in violation of the Administrative Procedures Act;

(b) Petitioners/Plaintiffs were not afforded due process with respect to their confinement to the CMU or the attendant harsh, punitive, atypical conditions of confinement, i.e., the restrictions on their communications and other liberties;

(c) Petitioners'/Plaintiffs' confinement in the CMU and its attendant restrictions on their freedom of speech and/or freedom of association, does not bear a rational relationship to a legitimate government interest, or it is an exaggerated response to such an interest;

(d) Petitioners'/Plaintiffs' confinement in the CMU and
the attendant restrictions on their communication and
other liberties, and the application upon them of harsh,
punitive, atypical conditions of confinement, is
discriminatory and based at least in significant part on
their perceived religious and/or political beliefs.

### Count Two: Violation of the APA -- Failure to Provide Notice

67. The creation of the CMU by Defendants McNulty, unknown
employees of the Correctional Programs Division, and Henry, and
their formulation of the CMU's policies and procedures, without
providing notice and opportunity for public comment, was a
violation of the Administrative Procedures Act.

### Count Three: Violation of the APA -- Arbitrary and Capricious Action

68. Defendant McNulty and Defendant unknown employees of the
Correctional Programs Division's actions in helping to select
Plaintiffs for confinement in the CMU were arbitrary, capricious,
an abuse of discretion, not in accordance with the law, and
without observance of procedure required by law, all in violation
of the Administrative Procedures Act.

69. The execution by all Defendants of the CMU's policies
and procedures, and their failure to act to effectuate Plaintiffs'
release from the CMU or the suspension of the CMU's policies and
procedures, is arbitrary, capricious, an abuse of discretion, not
in accordance with the law and without observance of procedure
required by law, all in violation of the APA.

## Count Four: Conspiracy to Violate Civil Rights

70. The agreement, actions, and failures to act of all Defendants constitute an intentional, unlawful, unconstitutional conspiracy to deprive Plaintiffs of their constitutional rights to due process, freedom of speech, freedom of association, and equal protection under the law.

## Count Five: Violation of Due Process

71. The actions and failures to act of Defendants McNulty, Jett, unknown employees of the Correctional Programs Division, Julian, Smith, Coleman, Grass, and Henry, resulting in the initial and/or continuing confinement of Plaintiffs in the CMU and the restrictions on their telephone use, visitation, and other liberties, constitute a violation of the right to due process secured to Plaintiffs under the Fifth Amendment to the U.S. Constitution.

## Count Six: Violation of Free Speech and Freedom of Association

72. The actions and failures to act of all Defendants resulting in the restrictions on Plaintiffs' telephone use and visitation constitute a violation of their freedom of speech and freedom of association secured to Plaintiffs under the First Amendment to the U.S. Constitution.

## Count Seven: Violation of Equal Protection

73. The actions and failures to act of all defendants constitute intentional, unlawful, and unconstitutional discrimination against Plaintiffs in violation of their constitutional right to equal protection of the laws, secured to Plaintiffs by the Fifth Amendment to the U.S. Constitution.

## Request for Relief

74. Wherefore, Plaintiffs request that the Court

(a) declare Plaintiffs' confinement in the CMU
   unconstitutional and/or contrary to law;

(b) declare the operation of the CMU unconstitutional and/or
   contrary to law;

(c) issue a writ of habeas corpus directing Respondent/
   Defendant Jett to deliver Petitioners from the CMU to
   the general population of any facility at which their
   degree of communication would be equal to that of general
   population inmates, and, in designating Plaintiffs, to
   adhere to BOP policy with respect to distance of the
   facility from Plaintiffs' homes and security level;

(d) award money damages in Plaintiffs' favor,  to punish
   Plaintiffs for their willful, wanton, grossly negligent
   conduct, to vindicate Plaintiffs' rights, and to
   compensate them for all fees and costs incurred  in this
   action.

(e) award such additional relief as the Court may deem
   proper.

Respectfull submitted,

Dated: _____ January, 2009

RANDALL TODD ROYER

Dated: _____ January, 2009

SEIFULLAH CHAPMAN

Dated: _____ January, 2009

SABRI BENKAHLA

I declare, under penalty of perjury, that the foregoing is true and correct.

RANDALL TODD ROYER

Executed on _____ January, 2009

SEIFULLAH CHAPMAN

Executed on _____ January, 2009

SABRI BENKAHLA

Executed on _____ January, 2009