UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

U.S. DISTRICT COURT
TERRE HAUTE DIVISION
FILED
JUL 27 2008
LAURA A. BRIGGS
CLERK

| | |
|---|---|
| Sabri Benkahla, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 2:09-cv-00025-WTL-DML |
| | ) |
| Federal Bureau of Prisons; | ) |
| Eric H. Holder, Attorney General of the | ) |
| United States; Harley G. Lappin, Director, | ) |
| Federal Bureau of Prisons; and | ) |
| Joyce K. Conley, Assistant Director, | ) |
| Correctional Programs Division, Federal | ) |
| Bureau of Prisons, | ) |
| in their official capacities, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## AMENDED COMPLAINT

### PRELIMINARY STATEMENT

1.     This is a challenge under the Administrative Procedure Act ("APA") to Federal Bureau of Prisons ("BOP") rules that severely curtail certain prisoners' communications with the outside world by condemning them to an unprecedented type of unit, dubbed a "Communication Management Unit" or "CMU." The creation of CMUs marked a dramatic change in policy and had no grounding in existing regulations, but BOP maneuvered to avoid public scrutiny and violated the APA's notice and comment requirement, 5 U.S.C. § 553, when it issued the new rules.

2.       Although BOP designed the CMUs primarily for prisoners viewed as terrorists, Plaintiff Sabri Benkahla, a federal prisoner confined in the CMU at the Federal Correctional Institution in Terre Haute, Indiana ("FCI Terre Haute"), was found *not guilty* of providing support to the Taliban in 2004.  The sentencing judge in the subsequent perjury trial that resulted in Mr. Benkahla's current convictions stated that Mr. Benkahla, a first time offender, "is not a terrorist," had "engaged in model citizenry," posed no threat of recidivism, and had "demonstrate[ed] his dedication to his four-year-old son."  *United States v. Benkahla*, 501 F. Supp. 2d 748, 759-61 (E.D. Va. 2007).  The Court "received more letters on [Mr. Benkahla's] behalf than any other defendant in twenty-five years, all attesting to his honor, integrity, moral character, opposition to extremism, and devotion to civic duty," *id.* at 760-61, including a letter from United States Representative James Moran which described Mr. Benkahla as "an upstanding and productive member of society."

3.       Nonetheless, as a CMU prisoner, Mr. Benkahla faces draconian restrictions on communications with friends and family has no interaction with non-CMU prisoners.  Should he remain in the CMU, Mr. Benkahla will not be permitted to hug his son, now six years old, for the duration of his ten-year sentence.

4.       BOP sends prisoners such as Mr. Benkahla to CMUs without a hearing and permits no review of ongoing placement in these units.  Prisoners condemned to CMUs have little hope of ever getting out.  Such unending confinement in stark isolation results from BOP's decision to evade the strictures of the APA by devising new rules behind closed doors.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. § 551 *et seq.* (Administrative Procedure Act).

6.      Defendants' creation of a CMU at FCI Terre Haute ("Terre Haute CMU") and their adoption of an Institution Supplement establishing the Terre Haute CMU, as described below, constituted final agency action under the APA.

7.      Venue in this Court is proper under 28 U.S.C. § 1391(e).

## PARTIES

8.      Plaintiff Sabri Benkahla is a United States citizen and a federal prisoner incarcerated at FCI Terre Haute.  Mr. Benkahla is 34 years old.

9.      Defendant BOP is a federal agency under the APA and is headquartered at 320 First St., NW, Washington, DC 20534.  BOP created the Terre Haute CMU in which Mr. Benkahla is confined and issued the Terre Haute CMU Institution Supplement.  BOP establishes regulations applicable to federal prisons and prisoners and creates and operates prison units in which prisoners are confined.  *See* 18 U.S.C. § 4042.

10.      Defendant Eric Holder is the Attorney General of the United States and the head of the United States Department of Justice.  BOP is an agency of the United States Department of Justice.  As such, Defendant Holder has ultimate authority over BOP decisions, including the decision to establish the Terre Haute CMU, the promulgation of BOP regulations, and the process of notice and comment rulemaking regarding BOP regulations.  *See* 18 U.S.C. § 4042. Defendant Holder is sued in his official capacity.

11.      Defendant Harley Lappin is, and has been at all times relevant to this case, Director of BOP.  Defendant Lappin exercises authority over BOP determinations, including the

3

decision to establish the Terre Haute CMU, the promulgation of BOP regulations, and the process of notice and comment rulemaking regarding BOP regulations. *See* 18 U.S.C. § 4041 & 4042. Defendant Lappin is sued in his official capacity.

12. Defendant Joyce K. Conley is, and has been since May 27, 2007, Assistant Director of BOP's Correctional Programs Division. The Correctional Programs Division approves the designation of prisoners to CMUs. According to BOP's website, Defendant Conley "directs all critical inmate management and program functions for the entire Bureau." Defendant Conley is sued in her official capacity.

## FACTS GIVING RISE TO THE CLAIMS FOR RELIEF

### I.     The Two Prosecutions of Mr. Benkahla

13. Mr. Benkahla is a United States citizen, born and raised in Virginia. He attended a Catholic elementary school in Falls Church, Virginia and a public high school in Fairfax County, Virginia.

14. Mr. Benkahla graduated with honors from George Mason University with a major in International Relations and Comparative Religion. Following graduation, Mr. Benkahla worked for a civil rights organization and taught elementary school in Maryland. Mr. Benkahla has served as an election officer for local, state, and national elections.

15. Mr. Benkahla received a scholarship to study Islamic Law and Jurisprudence in Medina, Saudi Arabia, where he became engaged. On the night before his wedding, Mr. Benkahla was abducted at gunpoint by officers of the Saudi secret police, who forced him into a car.

16. While in Saudi Arabia, Mr. Benkahla was held *incommunicado* in an eight foot by eight foot concrete cell, while his dumbfounded family wondered why he failed to appear at his

own wedding.  Without any charge or explanation, Mr. Benkahla was held in solitary confinement and allowed virtually no human contact, other than interrogations.  The bright lights in his cell were never turned off, resulting in sleep deprivation.

17.     United States District Court Judge Leonie Brinkema would later describe these conditions as "a Kafkaesque situation."  *United States v. Benkahla*, No. 1:03-cr-00296, 1/23/2004 Tr. at 70 (E.D.Va.) .

18.     After weeks of such confinement, an American consular officer informed Mr. Benkahla that he had been abducted and imprisoned at the behest of the FBI.  On an airport tarmac, Saudi police handed Mr. Benkahla off to the FBI, and he was flown to the United States.

19.     Now in the custody of his native country, Mr. Benkahla hoped for more humane treatment.  Instead, while being flown by the FBI from Saudi Arabia to the United States, he was forced to wear opaque goggles with duct tape, shackled in a painful position, and left in a sealed pod for approximately seventeen hours.

20.     Following a bench trial, Judge Brinkema found Mr. Benkahla not guilty of all charges against him (Supplying Services to the Taliban and Using a Firearm in Connection with a Crime of Violence).  In an oral ruling on March 9, 2004, Judge Brinkema found that the government failed to prove that Mr. Benkahla had supplied or attempted to supply material support to the Taliban or that he had engaged in any kind of military action.  *United States v. Benkahla*, No. 1:03-cr-00296-LMB, 3/9/2004 Tr. at 313 (E.D. Va.).

21.     Having acquitted Mr. Benkahla of all charges, Judge Brinkema stated:  "This case is now over in terms of trying it anyway."  *Id.* at 316.

22.     In fact, the case was not over.  Less than one month later, the government, unsatisfied with Mr. Benkahla's acquittal, obtained an order summoning him to testify before a

grand jury. The FBI questioned Mr. Benkahla in the following months, and he testified before a grand jury in the Eastern District of Virginia on August 26, 2004 and November 16, 2004.

23.    Both the FBI agent who interrogated Mr. Benkahla and the Assistant United States Attorney who examined him questioned Mr. Benkahla about a trip to Pakistan in 1999 and allegations that he visited a jihad training camp during this trip. This same conduct had been the focus of the March 2004 trial that resulted in a verdict of not guilty.

24.    On or about February 9, 2006, the government again indicted Mr. Benkahla, this time charging him with two counts of false declarations to the grand jury, false statements to the FBI, and obstruction of justice (a total of four counts). *United States v. Benkahla*, 1:06-cr-00009-JCC (E.D. Va.). Most of the allegedly false statements to the grand jury and the FBI involved the same subject matter as the prior trial. Mr. Benkahla was not charged with any crimes of terrorism.

25.    In the second trial, held before United States District Judge James C. Cacheris, the jury found Mr. Benkahla guilty of the offenses charged, although Judge Cacheris later vacated one of the counts for lack of evidence. As a result of the convictions at the second trial, Mr. Benkahla, who had no prior criminal history, faced a Sentencing Guidelines range of 33-41 months in prison (approximately three to three-and-one-half years).

26.    The government, however, moved for an enhancement that would result in a sentencing range of 210 to 262 months (seventeen-and-one-half years to nearly twenty-two years). Although the Court found that Mr. Benkahla's convictions in the second trial "neither *directly* 'involved' nor were 'intended to promote' a federal crime of terrorism," the Court concluded that the enhancement applied because Mr. Benkahla's statements had the effect of

obstructing the investigation of crimes of terrorism committed by others. *Benkahla*, 507 F. Supp. 2d at 751, 757.

27.    Judge Cacheris declared unequivocally that "Sabri Benkahla is not a terrorist." *Id.* at 759. Judge Cacheris found that Mr. Benkahla had no intention of promoting terrorism through false statements but instead "may have been motivated out of a desire not to be seen as involved with illegal activities. He may have been concerned about potential hardship he might cause others. He may have been embarrassed of his own conduct. Nevertheless, the Court does not believe Defendant had the willful intent to promote an act of terrorism." *Id.* at 760.

28.    The Court granted Mr. Benkahla a downward departure to a term of imprisonment of 121 months (ten years and one month). *Id.* at 762.

29.    Judge Cacheris found that Mr. Benkahla "has engaged in model citizenry, receiving a Master's degree from The Johns Hopkins University, volunteering as a national elections officer in local, state, and national elections, and demonstrating his dedication to his four-year-old son. It is clear that, in the case of the instant defendant, his likelihood of ever committing another crime is infinitesimal." *Benkahla*, 501 F. Supp. 2d at 759.

30.    Judge Cacheris further described Mr. Benkahla as "an American citizen, born and raised in Northern Virginia. He attended a local high school and college, excelling at both, and received a Master's degree at The Johns Hopkins University. He has a significant number of strong, positive relationships with friends, family, and the community." *Id.* at 760.

31.    Prior to sentencing, United States Congressman James Moran wrote a letter to Judge Cacheris. Congressman Moran stated:

> I have known the Ben Kahla family for close to twenty years. They are a decent, hard working, and patriotic family. They are good citizens who care about this country, admire and constructively participate in the political process.

> Mr. Ben Kahla has been very engaged in civic activities since he was a young man at JEB Stuart High School …. Always active in local politics, Mr. Ben Kahla worked on local campaigns and also served as an election officer.  He believed everyone had a civic duty to vote and spent considerable energies educating others on their voting rights.
> ….
>
> As a friend of the Ben Kahla family, I wish to submit for the record that I have experienced only positive interactions in the two decades I have known them.  To my knowledge, Mr. Ben Kahla has been an upstanding and productive member of society.

32.     A true and correct copy of Congressman Moran's letter to Judge Cacheris is attached hereto as Exhibit A and incorporated by reference herein.

33.     Mr. Benkahla is a classified as a minimum security prisoner.  He has been in BOP custody for nearly two years and has never received a conduct report or been charged with any disciplinary violation.

## II.     The Terre Haute CMU

34.     BOP formally established the Terre Haute CMU through an Institution Supplement dated November 30, 2006 ("Terre Haute CMU Institution Supplement").  A true and correct copy of the Terre Haute CMU Institution Supplement is attached hereto as Exhibit B and incorporated by reference herein.

35.     Upon information and belief, Defendants Lappin and Conley ordered or assented to the establishment of the Terre Haute CMU and the issuance of the Terre Haute CMU Institution Supplement, and Defendants Holder, Lappin, and Conley have ultimate authority over the ongoing existence and operation of the CMU.

36.     Since October of 2007, Mr. Benkahla has been confined in the Terre Haute CMU.

37.     In October of 2007, BOP issued to Mr. Benkahla a "Notice to Inmate of Transfer To Communication Management Unit" ("CMU Transfer Notice").   A true and correct copy of the CMU Transfer Notice is attached as Exhibit C and incorporated by reference herein.

38.     BOP gave Mr. Benkahla the notice *after* his transfer to the CMU had already occurred.

39.     Although Mr. Benkahla's status as a minimum security prisoner makes him eligible for far less restrictive conditions of confinement, Defendants severely limit his contact with the outside world because he is designated to the CMU.

## III.     Conditions in the CMU

### A.     No Contact Visits

40.     As a CMU prisoner, Mr. Benkahla is prevented from having any physical contact with visitors.   Thus, when Mr. Benkahla's son visits him in July of this year, Mr. Benkahla will not be allowed to hug his own son and will have to speak with him through a glass wall, using a telephone.

41.     Likewise, Mr. Benkahla must speak to visitors, including his fiancée, mother, father, nephew, and all other family members through a telephone, while the visitors sit in a separate, partitioned room.

42.     The Terre Haute CMU Institution Supplement states that all non-legal visits must be "conducted using non-contact facilities (i.e., secure partitioned rooms, telephone voice contact)." *See* Ex. B at 2.

43.     By contrast, most BOP prisoners meet with visitors in a visiting room without a partition and are allowed to hug, kiss, and shake hands with visitors.

44.     BOP's website states: "In most cases, handshakes, hugs, and kisses (in good taste) are allowed at the beginning and end of a visit." *See Visiting Room Procedures: General Information*, *available at* www.bop.gov/inmate_locator/procedures.jsp.

45.     BOP has published a separate Institution Supplement regarding visiting regulations for the Federal Correctional Complex in Terre Haute, Indiana (which includes FCI Terre Haute as well as the United States Penitentiary and Federal Prison Camp in Terre Haute) ("Institution Supplement – Visiting Regulations").   A true and correct copy of the Institution Supplement – Visiting Regulations is attached hereto as Exhibit D.

46.     The Institution Supplement – Visiting Regulations states that visitors must hang their coats "prior to greeting and *having physical contact* with an inmate(s)."   *See* Ex. D at 8 (emphasis added).

47.     Thus, on information and belief, most non-CMU prisoners at FCI Terre Haute are allowed contact visits.

**B.     Limited Visits**

48.     The Terre Haute CMU Institution Supplement states that for CMU prisoners: "Ordinarily, visiting will be scheduled to occur on weekdays for two-hour periods." *See* Ex. B at 3.

49.     Similarly, the Institution Supplement – Visiting Regulations states: "There will be no CMU visiting scheduled for the weekends or holidays." *See* Ex. D at 4.  The Institution Supplement – Visiting Regulations further states that for CMU prisoners, "[v]isiting hours are 8:30 A.M. to 10:30 A.M. and 12:00 P.M. to 2:00 P.M." *See* Ex. D at 4.

50.     Limiting CMU visits to these short hours on weekdays only makes it extremely difficult for Mr. Benkahla's family to visit him in Indiana because most of his family lives in Virginia and works on weekdays.

51.     Prisoners in the CMU are allowed only two visits a month for a maximum length of two hours each.

52.     By contrast, non-CMU prisoners at FCI Terre Haute are typically allowed seven visits a month, and additional visits may be authorized.  *See* Ex. D at 3.

**C.     Limited Telephone Calls**

53.     Mr. Benkahla and other prisoners in the CMU are allowed only one 15-minute non-legal telephone call per week.

54.     Prisoners in the CMU are allowed non-legal telephone calls only from 8:30 a.m. to 2:30 p.m., Monday through Friday.

55.     By contrast, BOP prisoners generally are allowed 300 minutes of outgoing telephone calls per month, assuming they have sufficient funds to make the calls.  This limit is ordinarily increased to 400 minutes per month in November and December.

56.     Because Mr. Benkahla is allowed only one 15-minute non-legal call per week to a single line, his family must gather together in order to speak with him.  It is extremely difficult for Mr. Benkahla's family to gather together from 8:30 a.m. to 2:30 p.m., Monday through Friday, because different family members work at different locations and children are in school.

57.     The Terre Haute CMU Institution Supplement purports to authorize yet further limitation of CMU prisoners' non-legal telephone calls to one three-minute call per month.  *See* Ex. B at 2.

### D.   Segregation

58.   Prisoners in the CMU are segregated from other prisoners at FCI Terre Haute and not allowed to have contact with non-CMU prisoners.

59.   The Terre Haute CMU Institution Supplement states that "[t]he CMU is a self-contained general population housing unit where inmates reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work programming within the confines of D-unit," *i.e.*, within the CMU.  Ex. B at 1.

60.   It is oxymoronic to describe the CMU as a "self-contained general population unit," Ex. B at 1, because placing prisoners in the self-contained unit by definition isolates them from the general population at FCI Terre Haute.

61.   When a CMU prisoner needs specialized medical services to be provided in the "main health services units," the Terre Haute CMU Institution Supplement requires "conditions which ensure D-Unit inmates' lack of contact with non-D-Unit inmates." Ex. B at 3. Thus, even on the rare occasions when prisoners are allowed to leave the CMU, they cannot have any contact with non-CMU prisoners.

62.   By contrast, most federal prisoners have access to various group activities that include prisoners from other units.

63.   Mr. Benkahla would like to participate in skills training programs and work opportunities that are not available to CMU prisoners.

## IV.   Lack of Rulemaking Procedures

64.   Generally speaking, BOP publishes three levels of rules and policy statements: (1) at the highest level, substantive regulations promulgated through notice and comment rulemaking and codified in the Code of Federal Regulations; (2) at the intermediate level,

national Program Statements, issued without notice and comment rulemaking, which reproduce the rules contained in the Code of Federal Regulations and provide additional interpretation and commentary regarding national policies; and (3) at the lowest level, Institution Supplements, also issued without notice and comment rulemaking, which apply the policies contained in Program Statements to single facilities.

65.     In this case, BOP evaded public scrutiny by issuing substantive rules, which require full notice and comment rulemaking, through mere Institution Supplements.   This strategy enabled BOP to curtail public scrutiny, in violation of the APA.

**A.     Abandonment of Initial Rulemaking**

66.     Prior to issuing the Terre Haute CMU Institution Supplement, BOP began a notice and comment proceeding for a similar rule, also aimed at restricting the communications of suspected terrorists in BOP custody.   BOP abandoned this rulemaking when faced with public criticism of the proposed rule.

67.     Specifically, on April 3, 2006, BOP published in the Federal Register a Notice of Proposed Rulemaking entitled "Limited Communication for Terrorist Inmates," 71 Fed. Reg. 16520 (Apr. 3, 2006) ("Notice of Proposed Rulemaking").   A true and correct copy of the Notice of Proposed Rulemaking is attached hereto as Exhibit E and incorporated by reference herein.

68.     On June 2, 2006, comments on the proposed rule were filed by civil rights and civil liberties groups including the American Civil Liberties Union, the Center for National Security Studies, the Legal Aid Society, and the National Lawyers Guild.   A true and correct copy of the comments is attached hereto as Exhibit F and incorporated by reference herein.   The comments stated, *inter alia*, that "[t]he proposed regulation is poorly conceived, almost certainly unconstitutional, and entirely unnecessary."   *See* Ex. F, at 7.

69.     Just as the Terre Haute CMU Institution Supplement severely restricts communications, the proposed rule would have allowed for severe limitation of visitation and non-legal telephone calls.  *See* Ex. E, 71 Fed. Reg. at 16524 (Proposed 28 C.F.R. §§ 540.203(a) & 540.204(a)(1)).

70.     Following the submission of comments by the ACLU and other civil rights organizations, BOP abandoned the proposed rule.

71.     To this day, BOP has not taken final action on the Notice of Proposed Rulemaking or finalized the proposed rule.

72.     Instead, BOP simply issued the Terre Haute CMU Institution Supplement without notice and comment proceedings.  BOP dated the Terre Haute CMU Institution Supplement November 30, 2006 – less than six months after comments criticizing the original proposed rule were submitted.

**B.     Failure To Comply with the APA**

73.     As detailed below, BOP did not engage in required notice and comment rulemaking when it issued the Terre Haute CMU Institution Supplement.

**1.   Notice and Comment Required**

74.     The Terre Haute CMU Institution Supplement contains rules as defined by the APA, *i.e.*, agency statements of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency.  *See* 5 U.S.C. § 551(4).

75.     None of the circumstances that excuse notice and comment rulemaking apply here.

76.     First, the rules contained in the Terre Haute CMU Institution Supplement do not involve a military or foreign affairs function of the United States or a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.  *See* 5 U.S.C. § 553(a) (1) & (2).

77.     Second, the Terre Haute CMU Institution Supplement contains rules that are not interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.  *See* 5 U.S.C. § 553(b)(3)(A).

78.     Third, the Terre Haute CMU Institution Supplement does not contain a finding that notice and public procedure are impracticable, unnecessary, or contrary to the public interest.  *See* 5 U.S.C. § 553(b)(3)(B).

### 2.  Lack of Notice of Proposed Rulemaking

79.     BOP and Defendants Lappin and Conley never published the Terre Haute CMU Institution Supplement as a proposed rule in the Federal Register.  *See* 5 U.S.C. § 553(b).

80.     Prior to issuing the Terre Haute CMU Institution Supplement, BOP and Defendants Lappin and Conley did not publish general notice of proposed rulemaking in the Federal Register.  *See* 5 U.S.C. § 553(b).

81.     Prior to issuing the Terre Haute CMU Institution Supplement, BOP and Defendants Lappin and Conley did not publish in the Federal Register: (1) a statement of the time, place, and nature of public rule making proceedings related to the establishment of CMUs; (2) reference to the legal authority under which a rule regarding CMUs was proposed; or (3) either the terms or substance of a proposed rule regarding CMUs or a description of the subjects and issues involved. *See* 5 U.S.C. § 553(b)(1)-(3).

82.     Prior to issuing the Terre Haute CMU Institution Supplement and establishing the Terre Haute CMU, BOP and Defendants Lappin and Conley did not name, personally serve, or otherwise give notice to all persons subject to the Terrre Haute Institution Supplement.  *See* 5 U.S.C. § 553(b).

### 3.  Failure To Request and Consider Public Comments

83.     BOP and Defendants Lappin and Conley never sought public comment on the Terre Haute CMU Institution Supplement under the APA.  *See* 5 U.S.C. § 553(c).

84.     Prior to issuing the Terre Haute CMU Institution Supplement and establishing the Terre Haute CMU, BOP and Defendants Lappin and Conley did not give all interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments, as required by the APA.  *See* 5 U.S.C. § 553(c).

85.     Prior to issuing the Terre Haute CMU Institution Supplement and establishing the Terre Haute CMU, BOP and Defendants Lappin and Conley did not consider written data, views, or arguments presented by interested persons, as required by the APA.  *See* 5 U.S.C. § 553(c).

### 4.  Failure To Publish a Final Rule

86.     BOP and Defendants Lappin and Conley never published the Terre Haute CMU Institution Supplement as a final rule in the Federal Register.  *See* 5 U.S.C. §§ 553(d) & 552(a)(1).

87.     The Terre Haute CMU Institution Supplement was not published in the Federal Register 30 days before its effective date.  *See* 5 U.S.C. § 553(d).

88.     None of the exceptions that could excuse failure to publish a final rule apply here.

89.     First, the Terre Haute CMU Institution Supplement contained substantive rules that were not interpretative rules or statements of policy.  *See* 5 U.S.C. § 553(d).

90. Second, the Terre Haute CMU Institution Supplement did not grant or relieve an exemption or relieve a restriction. *See* 5 U.S.C. § 553(d)(1).

91. Third, the Terre Haute CMU Institution Supplement did not contain a finding of good cause not to apply the requirement of publication in the Federal Register. *See* 5 U.S.C. § 553(d)(3).

92. BOP later issued the Institution Supplement – Visiting Regulations (Ex. D). The Institution Supplement – Visiting Regulations reiterated rules contained in the Terre Haute CMU Institution Supplement but also was issued without notice and comment rulemaking.

**C.      Second CMU Established Without APA Procedures**

93. Approximately fifteen months after issuing the Terre Haute CMU Institution Supplement, BOP then established *another* CMU at the United States Penitentiary in Marion Illinois ("USP Marion"). Defendant Conley issued a memorandum, dated March 5, 2008 ("Conley Memorandum"), which stated that the "need for CMU bed space has exceeded the capacity and a second CMU will be established at USP Marion, Illinois in the near future." A true and correct copy of the Conley Memorandum, with redactions made by the government in releasing the document pursuant to a Freedom of Information Act request, is attached hereto as Exhibit G and incorporated by reference herein.

94. On March 20, 2008, approximately 15 months after the issuance of the Terre Haute CMU Institution Supplement, BOP issued an Institution Supplement establishing a second CMU at USP Marion ("Marion CMU Institution Supplement"). A true and correct copy of the Marion CMU Institution Supplement (without attachments) is attached hereto as Exhibit H and incorporated by reference herein.

95.     BOP and Defendants Lappin and Conley never published the Marion CMU Institution Supplement as a proposed rule in the Federal Register, never sought public comment on the Marion CMU Institution Supplement under the APA, and never published the Marion CMU Institution Supplement as a final rule in the Federal Register.

V.      **No Regulatory Framework for CMUs**

96.     The issuance of the Institution Supplements marked a major change in BOP policy which required notice and comment rulemaking, for the Institution Supplements established an unprecedented type of unit and contained substantive rules.

97.     Rather than promulgating the new rules through the proper channels, however, BOP attempted to shoehorn CMUs into various other preexisting regulations – including regulations regarding control units and administrative and disciplinary segregation.  The Terre Haute CMU Institution Supplement in fact violates such regulations.

A.      **CMUs as Control Units**

98.     BOP's Office of General Counsel has categorized the CMU as a Control Unit. When Mr. Benkahla filed a grievance complaining about his ongoing placement in the CMU, BOP classified his grievance as a complaint about "CONTROL UNIT PLACEMENT."  *See infra* ¶ 200; Ex. CC.  This document was a response to an administrative appeal by Mr. Benkahla to BOP's Central Office in Washington, D.C.  Under 28 C.F.R. §§ 542.11 and 542.15, it is BOP's Office of General Counsel that responds to such appeals.

99.     Title 28 C.F.R. § 541.40(a) states:  "In an effort to maintain a safe and orderly environment within its institutions, the Bureau of Prisons operates control unit programs intended to place into a separate unit those inmates who are unable to function in a less

restrictive environment without being a threat to others or to the orderly operation of the institution."

100.    The Terre Haute CMU Institution Supplement states that CMU prisoners "reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work programming within the confines of D-Unit," *i.e.*, the CMU.  *See* Ex. B at 1.

101.    The Terre Haute CMU Institution Supplement further states:  "The CMU is established to house inmates who, due to their current offense of conviction, offense conduct, or other verified information, require increased monitoring of communication between inmates and persons in the community in order to protect the safety, security, and orderly operation of Bureau facilities, and protect the public."  *See* Ex. B at 1.

102.    Thus, under the terms used in the control unit regulations, the CMU is a "separate unit," and prisoners are placed there based on the belief that "in a less restrictive environment" they would be "a threat to others or to the orderly operation of the institution."  28 C.F.R. § 541.40(a).

103.    The CMU is therefore a "control unit program" under 28 C.F.R. § 541.40(a).

104.    Despite the status of CMUs as control units, the Terre Haute CMU Institution Supplement violates regulations applicable to control units.  BOP could have amended such regulations through notice and comment rulemaking, but BOP instead issued the Institution Supplements without rulemaking procedures.

### 1.      Lack of Hearing To Challenge CMU Placement

105.    Existing control unit regulations give prisoners a right to a live hearing before being placed in a control unit.  Specifically, 28 C.F.R. § 541.43(a) states that a "Hearing Administrator shall provide a hearing to an inmate recommended for placement in a control

unit." Section 541.43 further provides: (1) that a prisoner shall receive 24 hour advance notice of the hearing and the evidence against him or her, unless such evidence would likely endanger staff or others; (2) that a prisoner has the right to representation by a staff member; (3) that the prisoner has the right to be present throughout the hearing, except where institutional security or good order would be jeopardized; and (4) that the prisoner is entitled to present documentary evidence and to have witnesses appear, provided that calling witnesses would not jeopardize or threaten institutional security or individual safety, and further provided that the witnesses are available at the institution where the hearing is being conducted.

106.    Title 28 C.F.R. § 541.45 provides for review of the hearing decision by an Executive Panel and appeal from the Executive Panel's decision to the BOP Office of General Counsel.

107.    In contrast to the hearing procedures described above, the Terre Haute CMU Institution Supplement states: "You may appeal your transfer to D-Unit, or any conditions of your confinement, through the Bureau's Administrative Remedy Program, 28 C.F.R. §§ 542.10 through 542.19." Ex. B at 5.

108.    The Administrative Remedy Program described in 28 C.F.R. §§ 542.10 through 542.19 does not provide for a live hearing before a hearing administrator, 24 hour advance notice of the hearing and the evidence against the prisoner, representation of a prisoner by a staff member, the presentation of documentary evidence at a live hearing, testimony by witnesses at a hearing, or review of hearing decisions by an Executive Panel.

109.    Mr. Benkahla has never been allowed to challenge his designation to the CMU through a live hearing.

110.    Mr. Benkahla has never been allowed to challenge his designation to the CMU with representation by a staff member, by presenting documentary evidence at a hearing, or by having witnesses appear.

111.    Mr. Benkahka has never been allowed Executive Panel review of a hearing decision regarding his placement in the CMU.

### 2.    No Review of Ongoing Placement in the CMU

112.    In addition to providing a hearing prior to placement in a control unit, federal regulations also require BOP to provide regular review of a prisoner's ongoing placement in a control unit.

113.    Title 28 C.F.R. § 541.49 provides:

(a) … Once every 30 days, the control unit team, comprised of the control unit manager and other members designated by the Warden (ordinarily to include the officer-in-charge or lieutenant, case manager, and education staff member assigned to the unit), shall meet with an inmate in the control unit. The inmate is required to attend the team meeting in order to be eligible for the previous month's stay in the control unit to be credited towards the projected duration of confinement in that unit. The unit team shall make an assessment of the inmate's progress within the unit and may make a recommendation as to readiness for release after considering the inmate's:

(1) Unit status;

(2) Adjustment; and

(3) Readiness for release from the unit. (See § 541.50(a))

(b) The Warden shall serve as the review authority at the institutional level for unit team actions.

(c) An inmate may appeal the Warden's decision to the Executive Panel within five working days of receipt of that decision. The inmate will receive a response to this appeal at the inmate's next appearance before the Executive Panel.

(d) At least once every 60 to 90 days, the Executive Panel shall review the status of an inmate in a control unit to determine the inmate's readiness for release from

the Unit. The Executive Panel shall consider those factors specified in § 541.50(a), along with any recommendations by the unit team and Warden.

The decision of the Executive Panel is communicated to the inmate. Ordinarily, the inmate is interviewed in person at this review. If the inmate refuses to appear for this review, or if there is other reason for not having an in-person review, this will be documented.

(e) An inmate may appeal a decision of the Executive Panel, through the Administrative Remedy Procedure, directly to the Office of General Counsel, Bureau of Prisons within 30 calendar days from the date of the Executive Panel's response.

114.    The Terre Haute CMU Institution Supplement does not provide for review of prisoners' placement in the CMU by a control unit team.

115.    The Terre Haute CMU Institution Supplement does not provide for appeals regarding CMU placement by an Executive Panel or appeals from Executive Panel decisions.

116.    Prisoners' placement in the CMU is not reviewed every 30 days by a control unit team.

117.    The only "team meetings" that Mr. Benkahla has been allowed to attend do not include any review of his placement in the CMU.  Instead, these team meetings, which typically last 5-10 minutes, only involve discussion of matters such as funds in prisoner accounts and programs available to prisoners.  Such team meetings occur only once every six months, not every 30 days.

118.    When Mr. Benkahla has asked at these team meetings to be transferred out of the CMU, FCI Terre Haute officials have told him that, given the authority to do so, they would recommend his transfer but that they lack the power to make such a recommendation.

119.    Mr. Benkahla has never been given an opportunity to appeal any recommendation as to his readiness for release from a control unit team to the Executive Panel, nor has he

received notice of any decision or recommendation by the Executive Panel regarding his readiness for release from the CMU.

### 3. Lack of Notice of Projected Duration and Criteria for Release

120.    Title 28 C.F.R. § 541.47 provides:

Staff shall provide an inmate admitted to a control unit with:

(a) Notice of the projected duration of the inmate's confinement in a control unit;
…
(f) The criteria for release from the unit, and how those criteria specifically relate to this confinement period in the unit and any specific requirements in the inmate's individual case.

121.    By contrast, the Terre Haute CMU Institution Supplement does not contain any procedures for notifying CMU prisoners of the projected duration of CMU confinement or criteria for release.

122.    The blank "Notice to Inmate of Transfer to Communication Management Unit," which is included as Attachment A to the Terre Haute CMU Institution Supplement (Ex. B) does not include a space to state the projected duration of a prisoner's confinement in the CMU.

123.    Similarly, the CMU Transfer Notice issued to Mr. Benkahla does not state the projected duration of Mr. Benkahla's confinement in the CMU.  *See* Ex. C.

124.    BOP has not provided Mr. Benkahla with notice of the projected duration of his confinement in the CMU.

125.    BOP does not provide prisoners confined in the CMU with criteria for release from the CMU.

126.    Upon information and belief, no prisoner has ever been transferred from the CMU to a unit with less restrictive conditions.

### 4.  CMU Designation Based Solely on Offense

127.  Title 28 C.F.R. § 541.41(b) states:

(b) The Warden shall consider the following factors in a recommendation for control unit placement.

(1) Any incident during confinement in which the inmate has caused injury to other persons.

(2) Any incident in which the inmate has expressed threats to the life or well-being of other persons.

(3) Any incident involving possession by the inmate of deadly weapons or dangerous drugs.

(4) Any incident in which the inmate is involved in a disruption of the orderly operation of a prison, jail or other correctional institution.

(5) An escape from a correctional institution.

(6) An escape attempt. Depending on the circumstances, an escape attempt, considered alone or together with an inmate's prior history, may warrant consideration for a control unit placement.

(7) The nature of the offense for which committed. *An inmate may not be considered solely on the nature of the crime which resulted in that inmate's incarceration*; however, the nature of the crime may be considered in combination with other factor(s) as described in paragraph (b) of this section.

(emphasis added.)

128.  The Terre Haute CMU Institution Supplement states:  "The CMU is established to house inmates who, due to their current offense of conviction, offense conduct, *or* other verified information, require increased monitoring of communication between inmates and persons in the community in order to protect the safety, security, and orderly operation of Bureau facilities, and protect the public." *See* Ex. B at 1 (emphasis added.).

129.  Thus, under the plain language of the Institution Supplement, a prisoner may be transferred to the CMU based solely on the current offense of conviction or offense conduct.

130.    The CMU Transfer Notice issued to Mr. Benkahla states that his transfer to the CMU was based on his "offense conduct."  *See* Ex. C.

131.    The CMU Transfer Notice refers to none of the factors listed in 28 C.F.R. § 541.41(b) except "[t]he nature of the offense for which committed."

132.    The CMU transfer notice does not refer to: (1) any incident during confinement in which Mr. Benkahla has caused injury to other persons; (2) any incident in which Mr. Benkahla has expressed threats to the life or well-being of other persons; (3) any incident involving possession by Mr. Benkahla of deadly weapons or dangerous drugs; (4) any incident in which Mr. Benkahla was involved in a disruption of the orderly operation of a prison, jail or other correctional institution; (5) any escape from a correctional institution by Mr. Benkahla; or (6) any escape attempt by Mr. Benkahla.  *See* Ex. C.

133.    BOP has never found Mr. Benkahla to be involved in: (1) any incident during confinement in which he has caused injury to other persons; (2) any incident in which he has expressed threats to the life or well-being of other persons; (3) any incident involving possession of deadly weapons or dangerous drugs during confinement; (4) a disruption of the orderly operation of a prison, jail or other correctional institution; or (5) any escape from a correctional institution or any attempted escape.

134.    The Terre Haute CMU Institution Supplement states that prisoners transferred to the CMU "will be provided a **'NOTICE TO INMATE OF TRANSFER TO COMMUNICATION MANAGEMENT UNIT'** form indicating the reasons for their placement in the unit."

135.    The CMU transfer notice given to Mr. Benkahla (Ex. C) accurately states BOP's reasons for transferring him to the CMU.

136.    Mr. Benkahla was transferred to the CMU based solely on his criminal conviction.

137.    Upon information and belief, numerous other prisoners in the Terre Haute and Marion CMUs have received transfer notices which refer exclusively to their criminal convictions.

**B.    Administrative and Disciplinary Segregation**

138.    BOP has indicated that it issued the Terre Haute CMU Institution Supplement pursuant to regulations authorizing disciplinary segregation and administrative detention.  This attempt to characterize the CMU as a form of administrative detention or disciplinary segregation does not withstand scrutiny.

139.    Specifically, the Terre Haute CMU Institution Supplement displays the following notation on the upper right hand corner:  "Number: THX-5270.07A."  *See* Ex. B at 1.  The notation indicates that BOP purported to issue the Terre Haute CMU Institution Supplement pursuant to BOP Program Statement 5270.07, and the notation "THX" indicates that the Institution Supplement is specific to FCI Terre Haute.  Similarly, the Marion CMU Institution Supplement bears the notation "NUMBER: MAR-5270.07A."  *See* Ex. H at 1.

140.    Program Statement 5270.07 (www.bop.gov/policy/progstat/5270_007.pdf), is a set of policies issued by BOP pursuant to 28 C.F.R. §§ 541.10-.23.  These federal regulations and Program Statement 5270.07 govern administrative detention and disciplinary segregation.

141.    Despite this attempt to characterize CMU placement as a form of administrative detention or disciplinary segregation, the Terre Haute CMU Institution Supplement makes clear that placement in the CMU is *not* a form of administrative detention or disciplinary segregation.

142.    Specifically, the Terre Haute CMU Institution Supplement states that CMU prisoners "will ordinarily be housed in double-bunked cells.  Additionally, the unit contains a range of cells dedicated to segregated housing of those inmates in need of being placed in administrative detention or disciplinary segregation status.  Cells #8-13 are designated as

26

segregation housing for D-Unit inmates placed in administrative detention status or disciplinary segregation status." *See* Ex. B at 3.

143.    Thus, the Terre Haute CMU Institution Supplement makes it clear that CMU prisoners can be placed in administrative detention or disciplinary segregation in certain cells within the CMU but that designation to the CMU is independent of disciplinary segregation or administrative detention status.

144.    Indeed, there are currently approximately 40 prisoners in the FCI Terre Haute CMU, but the Terre Haute CMU Institution Supplement states that only six CMU cells (Cells #8-13) can be used for administrative detention and disciplinary segregation.

145.    The Terre Haute CMU Institution Supplement is also inconsistent with disciplinary segregation and administrative detention regulations in numerous respects, as detailed below.

### 1.    Disciplinary Segregation

146.    Placement in a CMU cannot be considered disciplinary segregation because disciplinary segregation results from conduct violations during a prisoner's incarceration. *See* 28 C.F.R. §§ 541.20; Program Statement 5270.07, Ch. 9, at 2.

147.    By contrast, under the Terre Haute CMU Institution Supplement, BOP can designate prisoners to the CMU solely on the basis of the current offense of conviction or offense conduct, regardless of whether a prisoner has engaged in conduct violations while incarcerated. *See infra* ¶¶ 128-37.

148.    BOP designated Mr. Benkahla to the CMU even though he has never been found responsible for – or even been charged with – a conduct violation.

27

149.    Furthermore, even when a prisoner has been charged with a conduct violation, 28 C.F.R. §§ 541.10-.23 and Program Statement 5270.07 require extensive procedures, including an investigation, live hearings, and appeals, to authorize disciplinary segregation.

150.    The Terre Haute CMU contains no such procedures, and Mr. Benkahla was designated to the CMU without the benefit of such procedures, including but not limited to the following: (1) the issuance of an incident report, *see* 28 C.F.R. §§ 541.14(a) & (b)(2); Program Statement 5270.07, Ch. 5, at 1-3; (2) an investigation of disciplinary charges, *see* 28 C.F.R. § 541.14(b); Program Statement 5270.07, Ch. 5, at 2-4; (3) an initial hearing before a Unit Discipline Committee ("UDC"), *see* 28 C.F.R. § 541.15; Program Statement 5270.07; Ch. 6, at 1-5; (4) a second hearing before a Discipline Hearing Officer ("DHO"), *see* 28 C.F.R. § 541.16-.18; Program Statement 5270.07, Ch. 7; and (5) the right to appeal decisions of the UDC or DHO, *see* 28 C.F.R. § 541.19; Program Statement 5270.07, Ch. 8.

151.    Prisoners in disciplinary segregation are also entitled to ongoing review of their placement through procedures including live hearings before a Segregation Review Official ("SRO") every 30 days.  *See* 28 C.F.R. § 541.20(c) & (d); Program Statement 5270.07, Ch. 9, at 2A.

152.    The Terre Haute CMU Institution Supplement does not contemplate such reviews, *see* Ex. B at 5, and Mr. Benkhala has not had the opportunity to participate in such reviews.

**2.      Administrative Detention**

153.    Program Statement 5270.07 and the regulations it implements also govern administrative detention, *see* Program Statement 5270.07, Ch. 9; 28 C.F.R. §§ 541.22, but placement in the CMU cannot be considered a form of administrative detention.

154.    In contrast to the administrative detention regulations, the Terre Haute CMU Institution Supplement does not entitle CMU prisoners to be present at hearings before an SRO every 30 days for review of ongoing confinement in the CMU.  *See* 28 C.F.R. § 541.22(c)(1); Program Statement 5270.07, Ch. 9, at 8A.

155.    Mr. Benkahla has never received a hearing regarding his ongoing placement in the CMU.

156.    In contrast to the administrative detention regulations, the Terre Haute CMU Institution Supplement does not entitle CMU prisoners to a record review conducted by an SRO within three business days of placement in the CMU. *See* 28 C.F.R. § 541.22(c)(1); Program Statement 5270.07, Ch. 9, at 8A.

157.    Upon information and belief, an SRO did not conduct a record review of Mr. Benkahla's placement in the CMU within three days of such placement.

158.    In contrast to the administrative detention regulations, the Terre Haute CMU Institution Supplement does not entitle CMU prisoners to a formal hearing before an SRO after seven days of administrative detention.  *See* 28 C.F.R. § 541.22(c)(1); Program Statement 5270.07, Ch. 9, at 8A.

159.    Mr. Benkahla never received such a formal hearing after seven days of confinement in the CMU.

160.    In contrast to the administrative detention regulations, the Terre Haute CMU Institution Supplement does not entitle CMU prisoners to weekly record review (without the prisoner present) of CMU placement.  *See* 28 C.F.R. § 541.22(c)(1); Program Statement 5270.07, Ch. 9, at 8A.

161.    Upon information and belief, Mr. Benkahla's placement in the CMU is not reviewed on the record each week by an SRO in Mr. Benkahla's absence.

162.    Title 28 C.F.R. §§ 541.22(b) requires a prisoner placed in administrative detention to be given an Administrative Detention Order within 24 hours of placement in administrative detention.  The Administrative Detention Order is to be issued on form BP-S308.  *See* Program Statement 5270.07, ch. 10, at 12.

163.    The Terre Haute CMU Institution Supplement does not contemplate issuance of a Form BP-S308 Administrative Detention Order, and Mr. Benkahla never received such an order.

**VI.    Violation of Existing Regulations Regarding Weekend Visits**

164.    The Terre Haute CMU Institution Supplement also violates existing regulations regarding visitation, which BOP failed to amend through notice and comment rulemaking.

165.    Title 28 C.F.R. 540.42(a) provides:

(a) Each Warden shall establish a visiting schedule for the  institution. *At a minimum, the Warden shall establish visiting hours at  the institution on Saturdays, Sundays, and holidays.* The restriction of  visiting to these days may be a hardship for some families and  arrangements for other suitable hours shall be made to the extent  practicable. Where staff resources permit, the Warden may establish  evening visiting hours.

(emphasis added.)

166.    This provision applies to all BOP prisoners.

167.    The Terre Haute CMU Institution Supplement states:  "Ordinarily, visiting will be scheduled to occur on weekdays for two-hour periods."  *See* Ex. B at 3.

168.    Similarly, the Institution Supplement – Visiting Regulations states:  "There will be no CMU visiting scheduled for the weekends or holidays." *See* Ex. D at 4.

169.    Prisoners in the CMU are not allowed to have visitors on weekends.

## VII.    Exhaustion of Administrative Remedies

170.    Mr. Benkahla submitted a series of grievances related to ongoing conditions in the CMU and his ongoing placement in the CMU.  He pursued all administrative appeals from the denial of these grievances, up to and including appeals to the BOP Central Office in Washington, DC.

171.    BOP incorrectly construed Mr. Benkahla's complaints about ongoing conditions in the CMU, including complaints about restrictions on telephone calls and visitation, as complaints about the *initial decision* to place Mr. Benkahla in the CMU.

172.    As a result, BOP erroneously concluded that each of these grievances was untimely because Mr. Benkahla did not file them immediately after being designated to the CMU.

173.    Since BOP violates its own regulations on control units, administrative detention, and disciplinary segregation by denying any review of ongoing designation to the CMU, *see infra* ¶¶ 112-119, Mr. Benkahla's only hope for internal review was through written grievances. But when BOP received written grievances from Mr. Benkahla, BOP took the view that unless Mr. Benkahla complained about a condition in the CMU within 20 days of designation to the CMU, he would be *forever barred* from complaining about any condition in the CMU for the duration of his ten-year sentence.  To the extent a prisoner confined for years in the CMU cannot complain about any issues not raised in the first 20 days, remedies are not available.

174.    The unavailability of remedies is compounded by the Terre Haute CMU Institution Supplement, which states, "You may appeal your transfer to D-Unit, or any conditions of your confinement, through the Bureau's Administrative Remedy Program, 28 C.F.R. §§

542.10 through 542.19."  Ex. B at 5.  Nowhere does the Institution Supplement suggest that any claim about CMU conditions not raised in the first 20 days will be permanently forfeited.

A.    **Complaint Regarding Visits**

175.    Mr. Benkahla submitted an Informal Resolution Form ("Informal Resolution Form (Visits)"), marked as received on July 21, 2008, in which he requested contact visits and additional visitation time.  A true and correct copy of the Information Resolution Form (Visits) is attached hereto as Exhibit I and incorporated by reference herein.

176.    Following the denial of his informal resolution request, Mr. Benkahla submitted a Request for Administrative Remedy ("Request for Administrative Remedy (Visits)"), dated July 23, 2008 and received on July 24, 2008, in which he requested contact visits and additional visitation time.  A true and correct copy of the Request For Administrative Remedy (Visits) is attached hereto as Exhibit J and incorporated by reference herein.

177.    Both the Informal Resolution Form (Visits) and the Request For Administrative Remedy (Visits) made it clear that Mr. Benkahla was complaining about ongoing conditions in the CMU, not the initial, discrete decision to place him there.

178.    The Administrative Remedy Coordinator, Terre Haute FCI, issued a Rejection Notice dated July 28, 2008 ("Terre Haute FCI Rejection Notice (Visits)"), which stated the Request For Administrative Remedy (Visits) had been rejected because:  "Your request is untimely.  Institution and CCC Requests (BP-09) must be received w/20 days of the event complained about."  A true and correct copy of the Terre Haute FCI Rejection Notice (Visits) is attached hereto as Exhibit K and incorporated by reference herein.

179.    Following the denial of the Request for Administrative Remedy (Visits), Mr. Benkahla filed a Regional Administrative Remedy Appeal, dated August 4, 2008 and received

on August 13, 2008 ("Regional Administrative Remedy Appeal (Visits)").  A true and correct copy of Mr. Benkhala's Regional Administrative Remedy Appeal (Visits) is attached hereto as Exhibit L and incorporated by reference herein.

180.   The Administrative Remedy Coordinator, North Central Regional Office issued a Rejection Notice on August 13, 2008 ("Regional Office Rejection Notice (Visits)"), adopting the same reasoning as the initial rejection.  A true and correct copy of the Regional Office Rejection Notice (Visits) is attached hereto as Exhibit M and incorporated by reference herein.

181.   Mr. Benkhala filed a Central Office Administrative Remedy Appeal, dated August 25, 2008 and received on September 2, 2008 ("Central Office Administrative Remedy Appeal (Visits)").  A true and correct copy of Mr. Benkhala's Central Office Administrative Remedy Appeal (Visits) is attached hereto as Exhibit N and incorporated by reference herein.

182.   The Administrative Remedy Coordinator, Central Office, issued a Rejection Notice dated September 11, 2008 ("Central Office Rejection Notice (Visits)"), again adopting the same reasoning as the initial rejection.  A true and correct copy of the Central Office Rejection Notice (Visits) is attached as Exhibit O and incorporated by reference herein.

**B.      Complaint Regarding Telephone Calls**

183.   Mr. Benkahla submitted an Informal Resolution Form ("Informal Resolution Form (Telephone Calls)"), marked as received on July 21, 2008.  A true and correct copy of the Information Resolution Form (Telephone Calls) is attached hereto as Exhibit P and incorporated by reference herein.

184.   Following the denial of his informal resolution request, Mr. Benkahla submitted a Request for Administrative Remedy ("Request for Administrative Remedy (Telephone Calls)"), dated July 23, 2008 and received on July 24, 2008.  A true and correct copy of the Request For

Administrative Remedy (Telephone Calls) is attached hereto as Exhibit Q and incorporated by reference herein.

185. Both the Informal Resolution Form (Telephone Calls) and the Request For Administrative Remedy (Telephone Calls) made it clear that Mr. Benkahla was complaining about ongoing conditions in the CMU, not the initial, discrete decision to place him there.

186. The Administrative Remedy Coordinator, Terre Haute FCI, issued a Rejection Notice dated July 28, 2008 ("Terre Haute FCI Rejection Notice (Telephone Calls)"), which stated the Request For Administrative Remedy (Telephone Calls) had been rejected because: "Your request is untimely. Institution and CCC Requests (BP-09) must be received w/20 days of the event complained about." A true and correct copy of the Terre Haute FCI Rejection Notice (Telephone Calls) is attached hereto as Exhibit R and incorporated by reference herein.

187. Following the denial of the Request for Administrative Remedy (Telephone Calls), Mr. Benkahla filed a Regional Administrative Remedy Appeal, dated August 4, 2008 and received on August 13, 2008 ("Regional Administrative Remedy Appeal (Telephone Calls)"). A true and correct copy of Mr. Benkahla's Regional Administrative Remedy Appeal (Telephone Calls) is attached as Exhibit S and incorporated by reference herein.

188. The Administrative Remedy Coordinator, North Central Regional Office issued a Rejection Notice on August 13, 2008 ("Regional Office Rejection Notice (Telephone Calls)"), adopting the same reasoning as the initial rejection. A true and correct copy of the Regional Office Rejection Notice (Telephone Calls) is attached hereto as Exhibit T and incorporated by reference herein.

189. Following the denial of his Regional Administrative Remedy Appeal (Telephone Calls), Mr. Benkhala filed a Central Office Administrative Remedy Appeal, dated August 25,

2008 and received on September 2, 2008 ("Central Office Administrative Remedy Appeal (Telephone Calls)").  A true and correct copy of Mr. Benkahla's Central Office Administrative Remedy Appeal (Telephone Calls) is attached hereto as Exhibit U and incorporated by reference herein.

190.    The Administrative Remedy Coordinator, Central Office, issued a Rejection Notice dated September 11, 2008 ("Central Office Rejection Notice (Telephone Calls)"), which rejected Mr. Benkahla's grievance on the same basis, stating:  "Your request is untimely. Institution and CCC Requests (BP-09) must be received w/20 days of the event complained about."  A true and correct copy of the Central Office Rejection Notice (Telephone Calls) is attached as Exhibit V and incorporated by reference herein.

191.    Thus, BOP again incorrectly construed Mr. Benkahla's complaint to focus on his initial designation to the CMU rather than the current and ongoing telephone restrictions about which Mr. Benkahla actually complained.

### C.    Complaint Regarding Ongoing CMU Confinement

192.    Mr. Benkahla submitted an Informal Resolution Form, which was received on July 21, 2008 ("Informal Resolution Form (Current CMU Confinement)").  A true and correct copy of the Informal Resolution Form (Current CMU Confinement) is attached hereto as Exhibit W and incorporated by reference herein.

193.    Mr. Benkahla stated on the Informal Resolution Form (Current CMU Confinement):  "I am being improperly and incorrectly held in a Control Management Unit and request an immediate transfer to a regular prison that is w/in reasonable distance to my family and in accordance with my proper classification."

194.    Following his submission of the Informal Resolution Form (Current CMU Confinement), Mr. Benkahla filed a Request for Administrative Remedy, dated July 23, 2008 and received on July 24, 2008 ("Request for Administrative Remedy (Current CMU Confinement)").   A true and correct copy of Request for Administrative Remedy (Current CMU Confinement) is attached hereto as Exhibit X and incorporated by reference herein.   On the Request for Administrative Remedy (Current CMU Confinement), Mr. Benkahla stated in part: "The issue has not been properly addressed or resolved …. I would like to be redesignated to a camp facility that is w/in reasonable distance to my family …. This designation [a]ffects my elderly father, my 5 yr old son, my heartached mother and all my other siblings, family, and friends."

195.    The Administrative Remedy Coordinator, Terre Haute FCI issued a Rejection Notice on July 28, 2008 ("Terre Haute FCI Rejection Notice (Current CMU Confinement)").   A true and correct copy of the Terre Haute FCI Rejection Notice (Current CMU Confinement) is attached hereto as Exhibit Y and incorporated by reference herein.   The Terre Haute FCI Rejection Notice (Current CMU Confinement) stated:  "Your request is untimely.  Institution and CCC Requests (BP-09) must be received w/20 days of the event complained about."

196.    In effect, the Terre Haute FCI Rejection Notice (Current CMU Confinement) stated that because Mr. Benkahla did not file a Request for Administrative Remedy within 20 days of his initial placement in the CMU, the Administrative Remedy Request was untimely.

197.    Mr. Benkahla filed a Regional Administrative Remedy Appeal dated August 4, 2008 and received on August 13, 2008 ("Regional Administrative Remedy Appeal (Current CMU Confinement)").   A true and correct copy of the Regional Administrative Remedy Appeal

36

(Current CMU Confinement) is attached hereto as Exhibit Z and incorporated by reference herein.

198.    The Administrative Remedy Coordinator, North Central Regional Office issued a Rejection Notice on August 13, 2008 ("Regional Office Rejection Notice (Current CMU Confinement)").  A true and correct copy of the Regional Office Rejection Notice (Current CMU Confinement) is attached hereto as Exhibit AA and incorporated by reference herein.

199.    Mr. Benkahla filed a Central Office Administrative Remedy Appeal dated August 25, 2008 and received on September 2, 2008 ("Central Office Administrative Remedy Appeal (Current CMU Confinement)").  A true and correct copy of the Central Office Administrative Remedy Appeal (Current CMU Confinement) is attached hereto as Exhibit BB and incorporated by reference herein.

200.    The Administrative Remedy Coordinator, Central Office issued a Rejection Notice on September 11, 2008 ("Central Office Rejection Notice (Current CMU Confinement)").  A true and correct copy of the Central Office Rejection Notice (Current CMU Confinement) is attached hereto as Exhibit CC and incorporated by reference herein.   The Central Office Rejection Notice (Current CMU Confinement) restated the same language used in the earlier Rejection Notices regarding CMU confinement:  "Your request is untimely.  Institution and CCC Requests (BP-09) must be received w/20 days of the event complained about."

201.    The Central Office listed the subject matter of Mr. Benkahla's complaint as "CONTROL UNIT PLACEMENT."

## CLAIM FOR RELIEF

### Lack of Notice and Comment Rulemaking – 5 U.S.C. §§ 553 and 552(a)

202.    The allegations contained in paragraphs 1-201 are restated and incorporated by reference herein.

203.    The issuance of the Terre Haute CMU Institution Supplement and the Institution Supplement – Visiting Regulations and the creation of the Terre Haute CMU constitute final agency action under the APA.

204.    The Terre Haute CMU Institution Supplement and the Institution Supplement – Visiting Regulations contain substantive rules that required notice and comment rulemaking under 5 U.S.C. § 553 and publication in the Federal Register under 5 U.S.C. §§ 553 and 552(a).

205.    The fact that provisions in the Terre Haute CMU Institution Supplement and the Institution Supplement – Visiting Regulations are wholly inconsistent with existing regulations regarding control units, administrative detention, disciplinary segregation, and weekend visitation confirms the status of the new provisions as substantive rules that required notice and comment rulemaking.

206.    Defendants Lappin and/or Conley had the authority to engage in notice and comment rulemaking under 5 U.S.C. § 553 and to publish final rules in the Federal Register under 5 U.S.C. §§ 553 and 552(a), but they did not do so.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court

   a.  Issue a judgment declaring that Defendants violated the Administrative Procedure Act by establishing the Terre Haute CMU and issuing the Terre Haute CMU Institution Supplement and Institution Supplement – Visiting Regulations without notice and comment rulemaking;

   b.  Order Defendants to engage in immediate notice and comment rulemaking regarding the establishment of CMUs;

   c.  Permanently enjoin Defendants from operating the Terre Haute CMU in violation of BOP regulations;

   d.  Order Defendants to comply with 28 C.F.R. 540.42 by establishing CMU visiting hours on Saturdays, Sundays, and holidays;

   e.  Award attorney's fees, costs, and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412;

   f.  Grant such other and further relief as this Court deems just and proper.

Dated this 18th day of June, 2009.

Respectfully submitted,


s/David M. Shapiro
David M. Shapiro
Staff Counsel
National Prison Project of the American Civil Liberties Union Foundation
915 15th Street, NW
7th Floor
Washington, DC 20005
Phone: (202) 393-4930
Fax: (202) 393-4931
Email: dshapiro@npp-aclu.org

Kenneth J. Falk
Legal Director
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN  46202
Phone: (317) 635-4059  ext. 104
Fax:  317/635-4105
Email:  kfalk@aclu-in.org