UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

SABRI BENKAHLA,                           )
                                          )
                Plaintiff,                )
                                          )
        v.                                )     CAUSE NO. 2:09-CV-00025-WTL-DML
                                          )
FEDERAL BUREAU OF PRISONS,                )
                                          )
                Defendant.                )


**BRIEF IN SUPPORT OF MOTION TO DISMISS, OR IN THE ALTERNATIVE,
MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, Sabri Benkahla, has filed a Complaint against the Federal Bureau of

Prisons (hereafter "BOP" or "Bureau") under the Administrative Procedures Act ("APA"), 5

U.S.C. § 552, *et. seq.* and § 701, *et seq.*, alleging that the Bureau of Prisons violated the APA's

notice and comment procedures by establishing a Communications Management Unit ("CMU")

at the United States Penitentiary ("USP") Terre Haute.  Benkahla's challenge fails because the

local guidance provided within the CMU is an interpretive rule or a general statement of policy

by the Bureau, neither of which require notice or comment under the APA.  Accordingly, the

Court lacks subject matter jurisdiction and must dismiss Benkhala's Complaint.

**FACTUAL AND LEGAL BACKGROUND**

**A.      FACTUAL BACKGROUND**

Sabri Benkahla, Federal Register Number 46867-083, is a Federal inmate currently

incarcerated at the Federal Correctional Institution, ("FCI") located within the Federal

Correctional Complex, Terre Haute, Indiana.   Plaintiff Benkahla has been confined at FCI Terre

Haute since

October 17, 2007.  He is serving a sentence of 121 months as a result of a conviction for false

statements-declarations and obstruction of justice.  The various false statements for which

Benkahla was convicted related to meeting and making phone calls to a Specially Designated

Terrorist and al-Qaida facilitator in Ireland who directed a European al-Qaida cell, which

provided support to operations in Europe by arranging travel and accommodations.  The

communications related to his conviction included utilizing telephone and e-mail messages to

communicate with persons associated with Lashkar-e-Taiba ("LET"), an identified Foreign

Terrorist Organization.  Those persons he was communicating with were associated with the

LET, participated in jihad training, and attended the training camp in Pakistan that Benkahla also

attended.[1]

Benkahla was convicted in the United States District Court for the Eastern District of

Virginia.  The Court applied a sentencing enhancement under U.S.S.G. section 3A1.4, finding

that the offenses of conviction were felonies that involved, or were intended to promote, a

federal crime of terrorism.  Full application of such enhancement would have resulted in a

sentence of 210 months, but the Court ultimately departed from the Guidelines and/or found a

variance from the Guidelines to be warranted.  Benkahla is projected to be released via Good

Conduct Time on May 5, 2016.

Based in part on this information, Benkahla was designated to the Communications

Management Unit ("CMU") at the Federal Correctional Complex ("FCC") Terre Haute, Indiana.

---

[1] The above is a representative rendition of Benkahla's conduct and is not an exhaustive listing.

He arrived at the CMU on October 17, 2007, and was provided with a Form BP-0944

Notification setting forth the reasons for his placement in the CMU.  Specifically, the form states

his offense conduct included significant communication with and support to LET, an identified

Foreign Terrorist Organization, which is committed to engaging in violence and terrorist activity

against the United States and its allies.  The form further indicated his transfer to the unit for

greater communication management was necessary to the safe, secure, and orderly operation of

Bureau institutions, or protection of the public.

The CMU was established to house inmates who, due to their current offense of

conviction, offense conduct, or other verified information, require increased monitoring of

communication between inmates and persons in the community in order to protect the safety,

security, and orderly operation of Bureau facilities, and protect the public.  The CMU is a self-

contained general population housing unit where inmates reside, eat, and participate in all

educational, recreational, religious, visiting, unit management, and work programming within

the confines of D-Unit.

Additionally, the unit contains a range of cells dedicated to segregated housing of those

inmates in need of being placed in administrative detention or disciplinary segregation status.

The purpose of the CMU is to provide an inmate housing unit environment that enables staff to

more effectively monitor communication between CMU inmates and persons in the community.

The comprehensive monitoring provided by the CMUs leads to greater protection for the public,

since reconstruction of communications from random monitoring may not provide a full scenario

if dangerous communications are discovered.  Also, consolidating high-risk inmates in the CMU

makes it more operationally feasible to minimize the adverse consequences such as the

communication delay to the monitored inmates, since the marshaling and organizing of resources into a standard approach makes it easier for translators and officials responding to requests for special exceptions to act quickly.  The volume, frequency, and methods of CMU inmate contact with persons in the community is limited as necessary to achieve the goal of total monitoring, consistent with the main purpose of the CMU.

Because the main purpose of the CMU limitations is to decrease the volume of communication and concentrate limited resources on more effective monitoring, the Terre Haute Institution Supplement's main purpose is likewise to provide guidance to staff on more effective monitoring through reduction of administrative burden.  Although the general conditions of the confinement in the CMU may be limited as necessary to provide greater management of communications, designation to the CMU is not punitive and, by itself, has no effect on the length of the inmate's incarceration.  CMU inmates continue to earn sentence credit in accordance with law and Bureau policy.  Of course, the Administrative Remedy Procedure is available to all CMU inmates to allow grievances to be submitted to the Bureau.  The Terre Haute Institution Supplement provides more detailed direction to staff on inmate communication limitations, which in turn results in an increase in effective monitoring and efficient use of staff resources - all as authorized by the Bureau's current regulatory scheme.

**B.    STATUTORY AND REGULATORY BACKGROUND**

**1.    Rules and Program Statements**

The BOP publishes information regarding the care and custody of inmates in the form of rules, more accurately known as federal regulations, which are published in the Federal Register pursuant to the APA requirements for public notice and comment, in the form of "Proposed

Rules." After publication of a proposed rule and receipt of public comment during the typical 60-day comment period, if the Bureau determines that the proposed rule should proceed, a "Final Rule" may be published. Once finalized, these become part of Title 28 of the Code of Federal Regulations ("CFR"). Federal Regulations that affect inmates directly (such as inmate discipline, visiting, correspondence, and religious practices) or describe rights, responsibilities, or obligations of inmates are generally appropriate subject matter for the Administrative Procedure Act process. *See* Program Statement 1221.66, Directives Management, available for review at http://www.bop.gov/DataSource/execute/dsPolicyLoc .[2]

By contrast, Bureau Program Statements are vehicles that contain guidance for staff, and are documents containing the Director's mandates to Bureau staff for implementing the details of the Bureau's various programs and federal regulations. The Bureau often includes the text of its published Federal Regulations in applicable Program Statements so staff may rely on one source for comprehensive guidance. Federal Regulation text is typically printed in bold type or in such other form so as to clearly distinguish it from what is commonly referred to in a Program Statement as "Implementing Text" or "non-rule" text. Compare Program Statement 5265.11 and 28 C.F.R. § 540; Program Statement 5267.08 and 28 C.F.R. § 500.14; and Program Statement 5264.08 and 28 C.F.R. § 540.100.

2. **Institution Supplements**

Institution Supplements are local directives issued by Wardens for implementing national Bureau directives (Program Statements, Program Manuals, and if necessary Operations

---

[2] Citations within this brief to national BOP Program Statements can be located at this cite without further citation.

Memoranda).  Generally, Institution Supplements are issued when necessary to provide local

information or procedures to staff.  The purpose of an Institution Supplement is to supplement,

not replace, its parent directives by providing local implementing instructions.

Each Supplement goes through a clearance process internally through the appropriate

departments, Associate Warden, and Warden, thereby ensuring an opportunity for review before

implementation.  *See* Program Statement 1221.66, Directives Management.

## ARGUMENT

### A.    DISMISSAL STANDARD

When considering a motion to dismiss for lack of subject matter jurisdiction under Fed.

R. Civ. P. 12(b)(1), the "district court must accept as true all well-pleaded factual allegations and

draw reasonable inferences in favor of the plaintiff."  *Rueth v. EPA*, 13 F.3d 227, 229 (7th Cir.

1993).  However, where the defendant raises factual questions concerning jurisdiction, the court

need not accept the allegations of the complaint as true, but "may look behind the complaint and

view the evidence to determine whether a controversy in fact exists."  *Int'l Harvester Co. v.

Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir. 1980).  Benkhala has the burden of supporting the

jurisdictional allegations in his Complaint by competent proof.  *Id.*  In deciding whether

Benkhala has carried this burden, the Court must look at the state of affairs as of the filing of the

Complaint.  *Id.*  As the party asserting federal jurisdiction, Benkhala also has the burden of

showing that the United States has waived its sovereign immunity with respect to his claims.

*United Phosphorous, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003); Fed. R. Civ.

P. 12(b)(1).

**B.      THE CREATION OF THE CMU IS NOT SUBJECT TO JUDICIAL REVIEW UNDER THE APA**.

   **1.      BENKAHLA'S PLACEMENT IN CMU IS NOT SUBJECT TO REVIEW UNDER THE APA.**

   The Court lacks subject matter jurisdiction because the BOP's decision to create the CMU is a decision committed solely to its discretion.  By enacting 18 U.S.C. § 3625, Congress intended to "carve out" an area of decision making committed solely to agency discretion committed solely to agency discretion and not subject it to judicial review.  *Lyle v. Sively*, 805 F. Supp. 755 (D. Ariz. 1992).  Pursuant to 18 U.S.C. § 3625, judicial review of Bureau designation decisions under the APA is prohibited except for unconstitutional conduct or *ultra vires* acts. Judicial review can be afforded under § 3625 where the agency action amounts to rule making, but no violation of the APA will be found for failure to provide notice and comment so long as the court finds the rule an interpretive rule rather than a legislative rule.  *See Minotti v. Whitehead*, 584 F. Supp. 2d. 750, 761-3 (D.Md. 2008).  Courts will only conduct a limited review where there is a constitutional violation or the agency exceeded authority in interpreting a statute contrary to well settled case law.  *See Davis v. Beeler*, 966 F. Supp. 483 (E.D. Ky. 1997).

   In the present challenge, Plaintiff does not allege unconstitutional conduct or *ultra vires* conduct.  Rather, Plaintiff complains that his transfer to a housing unit (the CMU), and the conditions of that confinement, were not the subject of notice and comment procedures alleged to be required under the APA.  *See* Plaintiff's Complaint, generally, and more specifically at  ¶¶ 3, 4, 39-63, 66-169.

   "The Attorney General . . . has the discretion to transfer federal prisoners from one place of confinement to another at any time for any reason whatsoever or for no reason at all."  *Brown-*

*Bey v. United States,* 720 F.2d 467, 470 (7th Cir. 1983).  An inmate has no liberty interest in remaining in general population or in being housed at any particular prison.  *Starks v. Powers*, 102 Fed.Appx. 40 (7th Cir. 2004) (unpublished).  Further, decisions related to inmate placement within the prison system and inmate monitoring are decisions routinely committed to BOP discretion.

Here, the Bureau's decision to establish the CMU does not create new "laws" to which inmates like Benkhala were not already subject.  The existing regulations and national policies, with their duly promulgated limitations as related to limiting and monitoring communications (visits, telephone calls, and correspondence, etc.), permit the Bureau to establish and configure a housing unit to effectuate those restrictions in order to preserve the safety, security, and good order of the Bureau facilities, the inmates, and to protect the public.  The limitation of the communications as related to certain high-risk inmates is necessary to facilitate the housing unit's establishment in that it more efficiently allows the monitoring of such communication, thereby easing the administrative burdens, staff requirements, and fiscal impact required by such monitoring, while optimizing productive monitoring of high risk inmates.

There is no statutory law that regulates the Bureau's discretion over its management of the facilities that it creates to house prisoners.  Title18 U.S.C. § 4001(b)(1) provides that "the control and management of Federal penal and correctional institutions . . . shall be vested in the Attorney General. . . ."  Under the specific direction of the United States Attorney General, the BOP is granted broad discretion and charge for the management and regulation of all penal and correctional institutions, and is responsible for providing suitable quarters and the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United

States. *See* 18 U.S.C. § 4042(a)(1) and (2).  Pursuant to 18 U.S.C. § 3621, prisoners are committed to the custody of the Bureau, and the Bureau is expressly authorized to designate a prisoner's place of confinement.  Moreover, the Bureau is also charged with the proper classification and segregation of federal prisoners according to the nature of the offenses committed, the character and mental condition of the prisoners and such other factors as should be considered in providing an individualized system of discipline, care, and treatment of the persons committed to such institutions.  *See* 18 U.S.C. § 4081.  The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau.  In determining what designation is appropriate and suitable for any given individual the Bureau considers: 1) the resources of the facility contemplated; 2) the nature and circumstances of the offense; and 3) the history and characteristics of the prisoner, and the Bureau may, at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another.  *See* 18 U.S.C. § 3621(b).  The selection and designation of an inmate to a proper facility, and his separation from other inmates for security reasons, are all part of this broad discretionary grant necessary to fulfill the Bureau's statutory requirement to keep their charges in safe and suitable quarters.

While the above statutes confer a duty on the Bureau, the manner in which the Bureau fulfills the duty is committed to its sound discretion.  The decision of where to house an inmate is at the sole discretion of the BOP.  *Caudle v. United States*, 72 F.3d 132 (7th Cir. 1995) (unpublished) (citing *Moody v. Daggett*, 429 U.S. 78, 88 n. 9 (1976)).  *See also United States v. Gomez-Vieyra*, 112 Fed.Appx. 521 (7th Cir. 2004) (unpublished)**.**  Since the decision related to the housing and designation of inmates is entrusted to the Attorney General's sole discretion and

delegation, issues related to when, where, and under what circumstances an inmate is housed, within the BOP's rules and regulations, is not subject to APA review.

**C.     THE TERRE HAUTE INSTITUTION SUPPLEMENT DID NOT REQUIRE NOTICE OR COMMENT UNDER THE APA.**

The "United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (citation omitted, internal punctuation omitted). The APA does not subject every act of an agency to judicial review, but rather limits its waiver of sovereign immunity to review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see also id.* § 702 ("A person suffering legal wrong because of agency action, . . . is entitled to judicial review thereof.").

Although Benkhala improperly filed his Complaint under the APA with regard to his conditions of confinement, it appears that he also alleges that the Bureau's decision to create the CMU, and the decision to adopt a corresponding institution supplement, constituted the "promulgation of Bureau of Prisons regulations," which required the Bureau to engage in notice and comment procedures. The APA does not provide a proper waiver of sovereign immunity in this matter because, as discussed in more below, the Terre Haute Institution Supplement is an interpretive rule or a general statement of policy, which does not require notice or comment under the APA. Therefore, since the APA does not apply, the Complaint fails to establish a waiver of the United States' sovereign immunity, and this Court is without jurisdiction in this matter.

10

1.      **The Terre Haute Institution Supplement Is Interpretive, Not Legislative.**

Under the APA, an agency intending to engage in rulemaking generally must publish a notice of the rulemaking in the Federal Register and provide interested persons with the opportunity to comment.  5 U.S.C. § 553(b).  The APA defines the term "rule" in part as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy. . . ."  5 U.S.C. § 551(4).  These have come to be known as "legislative rules" that require APA notice and comment procedures in order to become federal regulations with the force of law.

The notice and comment provisions do not apply, however, to interpretive rules or general policy statements.  5 U.S.C. § 553(b).  Section 553(b)(3)(A) specifically excludes "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice," from the notice and comment procedures.  *See*, *e.g., Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980) (discussing "information letters") (quoted in *Industrial Safety Equipment Ass'n, Inc. v. EPA*, 837 F.2d 1115, 1121 n. 11 (D.C. Cir. 1988)).

In determining whether a rule is "interpretive" rather than "legislative," the Seventh Circuit has focused the analysis on the "kind of power the agency is using. . . ."  *MSD of Wayne Twsp. v. Davila*, 969 F.2d 485, 490 (7th Cir. 1992). Agencies charged with enforcing and administering a statute have "inherent authority to issue interpretive rules informing the public of the procedures and standards it intends to apply in exercising its discretion."  *Production Tool v. Employment & Training Admin.*, 688 F.2d 1161, 1166 (7th Cir. 1982) (citing *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), superceded by statute on other grounds as stated in *Int'l Union United Auto., Aerospace & Agr. Implement Workers, UAW v. Johnson Controls, Inc.*, 499

U.S. 187, 218-19 (1991)).  Conversely, legislative rules have the force of law and are "as binding on the courts as congressional enactments."  *See MSD of Wayne Twsp.* 969 F.2d 492.  *See also Production Tool*, 688 F.2d at 1165 (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979)).

"If a rule creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself, then it is substantive." *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992).  However, if a statement is "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," then it is interpretive.  *Warder v. Shalala*, 149 F.3d 73, 79 (1st Cir. 1998) (citing the *Attorney General's Manual on the Administrative Procedure Act* (1947)).  *See also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) (same).  In sum, interpretive rules explain or define particular terms in a statute or legislative rule and are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers."  *Chrysler Corp.*, 441 U.S. at 302  n. 31.

Based on the foregoing, Courts have found that, because implementing (non-bolded) text in Bureau Program Statements constitute "internal agency guidelines," such guidelines are "not 'subject to the rigors of the [APA], including public notice and comment.'"  *Phillips v. Hawk*, No. 98-5513, 1999 WL 325487, at * 1 (D.C. Cir. April 14, 1999) (unpublished) (quoting *Jacks v. Crabtree*, 114 F.3d 983, 985 n. 1 (9th Cir. 1997).   The Bureau's Program Statements are internal agency interpretations of its statutory regulations--an internal agency statement of explanation that is consistent with the regulation it clarifies.  *Parsons v. Pitzer*, 149 F.3d 734, 738 (7th Cir. 1998).

A policy statement is not a substantive rule, subject to notice-and-comment, but is, rather,

an interpretive statement of position that provides administrative guidance in applying a Federal

regulation.  It is, therefore, not subject to rulemaking requirements.  *Pelissero v. Thompson*, 170

F.3d 442, 447 (4th Cir. 1999).  Interpretive rules are those which "merely clarify or explain

existing law or regulations," or are essentially "hortatory and instructional," and "[are] in the

form of an explanation of particular terms."  *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037,

1045 (D.C. Cir. 1987) (internal citation and punctuation omitted).  While the label an agency

attaches to its policy statement is not dispositive, a program statement is interpretive where it

clarifies or explains a regulation.  *Gunderson v. Hood*, 268 F.3d 1149, 1154 (9th Cir. 2001).  A

Bureau Program Statement is "akin to an 'interpretive rule'" *Reno v. Koray*, 515 U.S. 50, 61

(1995) (quoting *Shalala*, 514 U.S. at 99) and constitutes a statement of policy or rules of agency

practice or procedure.  In this regard, a Program Statement simply articulates the Bureau's

general guidance to staff on implementing and maintaining Bureau programs.[3]  Based on the

---

[3]  As the Seventh Circuit explained, in *Miller v. Henman*, 804 F.2d 421 (7th Cir. 1986) :

[I]f all the Attorney General has done is to tell his staff how he wants to exercise his
discretion-- language that brings his subordinates' acts in line with his wishes but does
not reduce his discretion to do otherwise--then there is no substantive rule enforceable in
any forum.  Whether we call the pronouncements 'internal personnel manuals' or
'precatory' or something else, they remain statements of the way in which discretion is
exercised but do not establish substantive rights.'  *See Schweiker v. Hansen*, 450 U.S.
785, 789 (1981) (an internal manual that is "not a regulation ... has no legal force, and it
does not bind" the agency).

*Miller*, 804 F.2d at 424.

[A] policy manual that contains criteria for action but is not a 'rule' within the meaning
of the APA does not fetter the discretion of the agency.  It is interpretive rather than
legislative.

*Miller*, 804 F.2d at 426.

foregoing, the Seventh Circuit and other federal courts have routinely held that BOP Program

Statements and Institution Supplements are internal agency guidelines  which are "akin to an

interpretive rule that do[es] not require notice and comment."  *Bunn v. Conley*, 309 F.3d 1002,

1005 (7th Cir. 2002) (quoting *Reno v. Koray*, 515 U.S. at 61).  *See also Parsons*, 149 F.3d at 738

("The [BOP] program statement in question is an internal agency statement of explanation that is

consistent with the regulation it clarifies. . ."); *Pelissero*, 170 F.3d at 477 ("A policy statement . .

. is not a substantive rule but rather an interpretative statement of position circulated within an

agency that serves to provide administrative guidance in applying a then existing published

rule.").   Thus, as set out in more detail below, the Terre Haute Institution Supplement subject to

the present challenge constitutes an interpretive rule or a general policy statement that does not

trigger the APA's notice and comment requirements.

**2.      The Institution Supplement is a General Statement of Policy.**

The APA does not apply in this case because the Terre Haute Institution Supplement

establishing the CMU is a general statement of policy that is not subject to notice or comment

---

The Bureau of Prisons has not promulgated its assignment policies as a rule under the APA.

*Id.*

The documents guide the staff rather than the prisoners.  The Bureau wants (as the introduction to Program Statement 5100.2 says) its "staff to use *professional judgment within specific guidelines*. The system was designed to emphasize staff flexibility in decision-making, yet provide a basis for more *consistent* decision-making across the Federal Bureau of Prisons." (Emphasis in the original.)  A jailer who gives erratic and unreliable classifications may have to answer to the Attorney General, but he does not have to answer to Miller."

*Miller*, 804 F.2d at 427.

procedures.  The APA does not define "general statement of policy."  However, case law from

the United States Court of Appeals for the District of Columbia illustrates the difference between

"rules" subject to the APA and "general statements of policy."  The key factor is the binding

nature of the rule on the agency.  "If a document expresses a change in substantive law or policy

(that is not an interpretation) which the agency intends to make binding, or administers with

binding effect, the agency may not rely upon the statutory exemption for policy statements, but

must observe the APA's legislative rulemaking procedures."  *General Electric Co. v. EPA*, 290

F.3d 377, 382-83 (D.C. Cir. 2002) (quoting Robert A. Anthony, *Interpretive Rules, Policy

Statements, Guidance, Manuals, and the Like-Should Federal Agencies Use Them to Bind the

Public*?, 41 DUKE L.J. 1311, 1355 (1992)).

Therefore, if a policy statement uses "mandatory, definitive language," that is binding on

the agency, then it does not qualify as a "general statement of policy."  *United States Telephone

Ass'n v. FCC*, 28 F.3d 1232, 1234 (D.C. Cir. 1994) (noting that it has "said repeatedly" that the

line between an invalid legislative rule and a valid policy statement "turns on an agency's

intention to bind itself to a particular legal policy position"); *Pub. Citizen, Inc. v. United States

Nuclear Regulatory Com'n*, 940 F.2d 679, 681-82 (D.C. Cir. 1991) ("In determining whether an

agency statement is a substantive rule, which requires notice and comment, or a policy

statement, which does not, the ultimate issue is 'the agency's intent to be bound.'"); *State of

Alaska v. United States Dep't of Transp.*, 868 F.2d 441, 445-46 (D.C. Cir. 1989) (a "general

statement of policy" must "genuinely leave[ ] the agency ... free to exercise discretion.")

(quoting *Community Nutrition Inst. v. Young*, 818 F.2d 943, 945-46 (D.C. Cir. 1987); *McLouth

Steel Products Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988) (if a statement denies the

15

decision maker discretion in the area of its coverage, so that he, she or they will automatically decline to entertain challenges to the statement's position the statement is binding and must be treated as a legislative rule).

For example, Program Statement 5265.11, incorporates the BOP's Federal Regulations in 28 C.F.R. § 540 regarding correspondence restrictions. Specifically, 28 C.F.R. § 540.12 states that the Warden shall establish and exercise controls to protect individuals, security, discipline, and the good order of the institution. The size, complexity, and security level of the institution, the degree of sophistication of the inmates confined, and other variables require flexibility in correspondence procedures. This regulation gives the Warden the authority to take an inmate's background and propensity for abuse into account when determining what limitations, if any, need be imposed.

Title 28 C.F.R. § 540.14 (a) indicates that institution staff shall open and inspect all incoming general correspondence. Outgoing correspondence may be opened and inspected in even minimum and low security institutions if there is reason to believe it would interfere with the orderly running of the institution, that it would be threatening to the recipient, or that it would facilitate criminal activity. Therefore, monitoring all correspondence in order to maintain security and prevent threats to the recipient or otherwise leads to criminal activity is already authorized by current regulations. The CMU correspondence limitations operate in this manner under the authority of the current regulations.

Additionally, Program Statement 5264.08, *Telephone Restrictions*, incorporates the regulations as set forth in 28 CFR 540.100 *et. seq.* These regulations authorize limitations upon an inmate's telephone privileges to ensure that these are consistent with other aspects of Bureau

16

correctional management responsibilities.  Inmate telephone use is subject to those limitations that the Warden determines are necessary to ensure the security or good order of the institution or to protect the public.  These regulations also authorize the Warden to establish procedures that enable monitoring of telephone conversations on any telephone located within the institution in order to preserve the security and orderly management of the institution and to protect the public. Therefore, the Warden's current authority in this section already allows for limitations, which take into account the Bureau's correctional management responsibilities and allow for protection of the public.  The CMU telephone limitations facilitate productive monitoring and protect the public by virtue of the information gained through monitoring and by the deterrent effect of the monitoring itself.

Likewise, Program Statement 5267.08, *Visiting Restrictions*, incorporates the rules as set forth in 28 CFR § 540.40, *et seq*.  Under the regulations, the Warden may limit inmate visiting when necessary to ensure the security and good order of the institution.  The CMU visiting limitations operate within the parameters of current regulations in that they are necessary to ensure productive monitoring of high-risk inmates without sacrificing the security or good order of the institution.[4]

Benkhala will likely argue that the Terre Haute Institution Supplement defining the CMU

---

[4]  Effective January 3, 2010, the following changes will be made to visiting and telephone use of CMU inmates: Social Calls-inmates will be allowed two, fifteen minute telephone calls/week.  The phone call schedule will be M-F (except federal holidays) between 8 a.m. and 8 p.m.  Sundays and federal holidays, telephone calls may be scheduled between 8 a.m. and 2:30 a.m.  Social Visiting - inmates will be allowed up to eight hours of visiting time/month. Visits may be scheduled in increments up to four hours at the discretion of the institution.  No single visit may be scheduled for a period longer than four hours.  Visits will be permitted Sunday-Friday from 8:30 a.m. to 2:30 p.m.  Social Visiting will be non-contact.

imposes additional limitations on him which were not previously imposed, thus rendering the Institution Supplement "legislative."  As the Seventh Circuit noted in *Production Tool*, however, the fact that the Bureau's decision to establish the CMU may have affected Benkhala's rights and obligations does not render the action "ipso facto legislative."  *Production Tool*, 688 F.2d at 1166.  *See also American Postal Workers Union, AFL-CIO v. United States Postal Service,* 707 F.2d 548, 559 (D.C. Cir. 1983) (holding that conclusive change in benefits calculation formula is interpretive).  That burdens may be imposed on Benkhala "only goes to the substantial impact of the statute and the regulations, not whether the regulations created law."  *MSD of Wayne Twsp.*, 969 F.2d at 490 (quoting *Alcaraz v. Block*, 746 F.2d 593, 613 (9th Cir. 1984)).  *See also American Postal Workers*, 707 F.2d at 559-60.

Moreover, as set forth above, the Bureau's decision simply imposes obligations that it was already entitled to impose.  That this had some impact on Benkhala is irrelevant.  Even if the decision represented a change in the way the Bureau was applying the law before, the Seventh Circuit has held that this does not necessarily make the new CMU guidance contained in the Terre Haute Institution Supplement, announcing those limitations and changes for CMU inmates, legislative.  That the guidance contained in the Terre Haute Institution Supplement "may have altered administrative duties or other hardships does not make them substantive [legislative]. " *MSD of Wayne Twsp.*, 969 F.2d at 492 (quoting *Alcaraz*, 746 F.2d at 613).  *See also id.* at 490 ("[A] new position does not necessarily make a rule legislative rather than interpretive.").  This is especially true when one considers that the limitations provided in the Terre Haute Institution Supplement are within the bounds of existing regulations, albeit more stringently applied to those inmates when safety and security deemed them necessary.

Benkhala may also argue that the Bureau's decision unfairly forces him to comply, and that he lacks any choice regarding compliance.  This argument is also not persuasive:  "[A]ll rules are 'binding' on the regulated parties in the sense that they set, for the time, the legal minima of behavioral standards.  The extent to which regulations are 'binding' in comparison to one another, however, is only an effect of the distinction between substantive and interpretive rules, not a criterion of the distinction."  *MSD of Wayne Twsp.*, 969 F.2d at 493 (quoting *Alcaraz*, 746 F.2d at 614).  *See also Cabais v. Egger*, 690 F.2d 234, 237 (D.C. Cir. 1982) ("Simply because agency action has substantial impact does not mean that it is subject to notice and comment if it is otherwise expressly exempt under the APA.").

The ability to issue interpretive rules within the agency guidance, such as the Terre Haute Institution Supplement at issue herein, "preserve[s] agency flexibility" and "allow[s] agencies to explain ambiguous terms in legislative enactments without having to undertake cumbersome proceedings." *American Hosp. Ass'n v. Bowen*, 834 F.2d at 1045.  *See also, e.g., United Technologies, Corp. v. EPA*, 821 F.2d 714 (D.C. Cir. 1987).  If Benkahla's challenge were allowed simply because his housing assignment subjects him to additional, albeit permissible, scrutiny, this Court would find, in essence, that any expression of agency opinion as stated in the Terre Haute Institution Supplement would have to be brought forward in new rules that would, therefore, always be construed as legislative.  This reasoning is contrary to law, has been repeatedly rejected, and should not be adopted in this case.  *See*, *e.g.*, *MSD of Wayne Twsp.*, 969 F.2d at 492; *American Postal Workers*, 707 F.2d at 558; *State of Michigan v. Thomas*, 805 F.2d 176, 182-84 (6th Cir. 1986).

The Terre Haute Institution Supplement is interpretive of existing rules and regulations,

and provides agency guidance on the application of those existing rules and regulations in

specific circumstances and to specific inmates, designated within the Bureau's discretion as

"high risk."  As such the APA does not apply to the Terre Haute Institution Supplement and

notice and comment prior to its issuance was not required.

## C.   28 U.S.C. § 1331 DOES NOT CONFER JURISDICTION OVER THE UNITED STATES.

In his Complaint, Benkhala alleges that 28 U.S.C. § 1331 and the APA, 5 U.S.C. § 551,

confers subject matter jurisdiction over this case.  *See* Plaintiff's Complaint, ¶ 5.  As set out

above the APA does not apply to the Terre Haute Institution Supplement providing guidance on

the housing of certain "high risk" inmates.  Without the APA, the Court is without jurisdiction

over the United States.  While "§ 1331 is very broad in granting original jurisdiction to the

district courts[,]" that broad grant "does not mean that jurisdiction is not precluded by another

statute or doctrine of judicial administration."  *Divine Farms, Inc. v. Block*, 679 F. Supp. 867,

869 (S.D. Ind. 1988).  Indeed, the broad grant of federal jurisdiction under § 1331 is clearly

precluded by the doctrine of sovereign immunity, as "[i]t is axiomatic that the United States may

not be sued without its consent and that the existence of consent is a prerequisite for

jurisdiction."  *United States v. Mitchell*, 463 U.S. 206, 212 (1983); *United States v. Sherwood*,

312 U.S. 584, 586-87 (1941) ("The United States, as sovereign, is immune from suit save as it

consents to be sued . . . and the terms of its consent to be sued in any court define that court's

jurisdiction to entertain the suit.") (collecting authority) (internal citations omitted).[5]

Section 1331 by its terms contains no such waiver of sovereign immunity; it merely gives

---

[5]The sovereign immunity of the United States extends to suits against its agencies.  *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994).

the district court jurisdiction to hear federal claims that are not otherwise barred.  *See Arvanis v. Noslo Eng'g Consultants, Inc.*, 739 F.2d 1287, 1290 (7th Cir. 1984) ("No citation is needed to reject appellants' suggestion that 28 U.S.C. § 1331 waives sovereign immunity.").  Benkhala alleges jurisdiction under the APA; however, as discussed above, the APA does not apply. 5 U.S.C. § 702.  Therefore, Section1331 does not waive the United States sovereign immunity, and this cause must be dismissed.

**E.**     **THE COURT SHOULD NOT RELEASE BENKHALA FROM THE CMU.**

In his Complaint, Benkhala requests, among other things, that the Court enjoin the Bureau from operating the CMU.  Even if the Court were to find that the Bureau is required to promulgate the rule through the APA's notice and comment procedures, the Court should not enjoin the Bureau from operating the CMU, but should instead remand the case to the Bureau for compliance with the rule-making procedures without vacating the CMU and the Institution Supplement.

The decision "whether to vacate [agency action found violative of the APA] depends on the seriousness of the order's deficiencies . . . and the disruptive consequences of an interim change that may itself be changed."  *Sugar Cane Growers Co-Op of Florida v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002) (quoting *Allied-Signal, Inc. v. United States Nuclear Reg. Com'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).  The PLRA also provides as follows:

> (1) Prospective relief.--(A) Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

21

18 U.S.C. § 3626(a)(1)(A).

Here, the security concerns supporting the CMU and Institution Supplement disfavor the Plaintiff's requested injunction.  As set forth above, the purpose of the CMU is to provide an inmate housing unit environment that enables staff to more effectively monitor communication between CMU inmates and persons in the community.  The comprehensive monitoring provided by the CMU leads to greater protection for the public, since reconstruction of communications from random monitoring may not provide a full scenario if dangerous communications are discovered.  Consolidation of high-risk inmates in the CMU makes it more operationally feasible to minimize the adverse consequences, such as the communication delay to the monitored inmates, since the marshaling and organizing of resources into a standard approach makes it easier for translators and officials responding to requests for special exceptions to act more quickly.  The volume, frequency, and methods of CMU inmate contact with persons in the community is limited as necessary to achieve the goal of total monitoring, consistent with the main purpose of the CMU.

Because the main purpose of the CMU limitations is to decrease the volume of communication and concentrate limited resources on more effective monitoring, the Terre Haute Institution Supplement's main purpose is likewise to provide guidance to staff on more effective monitoring through reduction of administrative burden.  Although the general conditions of the confinement in the CMU may be limited as necessary to provide greater management of communications, designation to the CMU is not punitive and, by itself, has no effect on the length of the inmate's incarceration.  CMU inmates continue to earn sentence credit in accordance with law and Bureau policy.  The Institution Supplement provides more detailed

22

direction to staff on inmate communication limitations, which in turn results in an increase in effective monitoring and efficient use of staff resources - all as authorized by the Bureau's current regulatory scheme.

In sum, the establishment of the CMU was based on legitimate security and safety concerns, *see Sugar Cane*, 289 F.3d at 151, to which the Court should afford deference. *Turner v. Safley*, 482 U.S. 78, 86-87 (1987). The PLRA requires that the relief "extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). For these reasons, the Court should dismiss the complaint for lack of subject matter jurisdiction or remand the case to the BOP for completion of a rule-making process, should the Court find that the process is necessary.

## CONCLUSION

Based on the foregoing, the Court should dismiss Benkhala's Complaint for lack of subject matter jurisdiction.

Respectfully submitted,

TIMOTHY M. MORRISON
United States Attorney

By:   /s/ *Thomas E. Kieper*
Thomas E. Kieper
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 17, 2009, a copy of the foregoing **BRIEF IN SUPPORT OF MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

> David M. Shapiro
> dshapiro@npp-aclu.org
>
> Kenneth J. Falk
> kfalk@aclu-in.org

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

> NONE.

/s/ *Thomas E. Kieper*

Thomas E. Kieper
Assistant United States Attorney

Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, IN 46204
(317) 226-6333
(317) 226-5027 [Fax]