UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| SABRI BENKAHLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 2:09-CV-00025-WTL-DML |
| | ) | |
| FEDERAL BUREAU OF PRISONS, | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY IN SUPPORT OF MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, Sabri Benkahla, presents no valid reason in his opposition brief why this Court should not dismiss Benkahla's complaint or grant summary judgment in favor of the Federal Bureau of Prisons. As explained in the Bureau's opening brief, the establishment of the Communications Management Unit did not require notice or comment under the Administrative Procedure Act, and thus is not subject to judicial review. For the reasons stated below, Benkahla's arguments in opposition are meritless.

**I.  Benkahla Can Challenge Neither His Placement In, Nor the Establishment of, the CMU, and His Complaint Must Be Dismissed**

From the outset, Benkahla's primary challenge regarding the CMU was his placement there, not any alleged violation of the APA in the Bureau's establishment of the CMU. Benkahla submitted various administrative remedy challenges of not only his placement in the CMU, but also restrictions stemming from that placement. (*See, e.g.*, Am. Compl. Ex. W.) Benkahla's complaint recounts these challenges; as those portions of the complaint are expressly incorporated into his claim for relief, his complaint may fairly be read as resurrecting these earlier challenges. Benkahla contends that the Bureau knocks down a straw man in dispensing

with any possible challenge to Benkahla's placement in the CMU; if so, it was a straw man of Benkahla's own making. In any event, the segregation of prisoners from the general population is as a general matter presumptively valid. *See, e.g.*, *Sandin v. Conner*, 515 U.S. 472, 485 (1995). So too is Benkahla's assignment to the CMU presumptively valid and unreviewable under the APA. *See Richmond v. Scibana*, 387 F.3d 602, 605 (7th Cir. 2004).

Perhaps recognizing these obstacles to a direct challenge to placement in the CMU, Benkahla's complaint attempts an end-around by purporting to challenge the CMU's establishment as violative of the APA. The gist of Benkahla's argument in his opposition brief is that the Bureau's CMU Institution Supplement constitutes a legislative rule requiring notice and comment under the APA. Benkahla is mistaken.

### A. The Institution Supplement Is Not a Legislative Rule Requiring Notice or Comment Under the APA

The challenged Institution Supplement is an interpretive rule, or a general statement of Bureau policy, in which the Bureau seeks to advise the public, and its staff, prospectively of the manner in which the Bureau proposes to exercise its discretionary power granted by specific statutes. *See Lincoln v. Vigil*, 508 U.S. 182, 197 (1993). As such, the Institution Supplement is exempt from the APA's notice and comment procedures. 5 U.S.C. § 553(b)(A). This exemption dooms Benkahla's APA challenge, and his complaint must be dismissed for lack of jurisdiction.

Benkahla expends great effort trying to characterize the Institution Supplement as something it is not, and those characterizations must be rejected. The Bureau has broad statutory authority to control and manage federal correctional institutions, including housing of prisoners committed to its custody. *See* 18 U.S.C. §§ 3621, 4001(b)(1), 4042(a)(1)-(2), 4081. This statutory authority is consistent with the deference that courts have traditionally afforded prison

administrators in the development and implementation of policies relating to prison administration. *Hornsby v. Miller*, 725 F.2d 1132, 1135 (7th Cir. 1984) ("The Attorney General is vested with broad discretion in the operation of federal prisons, see 18 U.S.C. § 4001(b), as are the prison officials whom the Attorney General supervises. . . .") (citation omitted); *cf. Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (instructing that prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security").

In accordance with its statutory authority, the Bureau established the CMU to house inmates who, due to their current offense of conviction, offense conduct, or other verified information, require increased monitoring of communication between those inmates and persons in the community in order to protect the safety, security, and orderly operation of Bureau facilities, and to protect the public. Determination of which inmates are to be assigned to the CMU remains within the discretion of the Attorney General's designated administrators. While the CMU is a general housing Unit, the CMU inmates are separated from the other general population and are subject to certain restrictions of which Benkahla complains, including restrictions on correspondence, telephone usage, and visitation. These restrictions flow from the Bureau's discretionary exercise of its broad statutory authority and are consistent with both existing regulations that were promulgated after notice and comment and Bureau program statements. See 28 C.F.R. § 540.12; § 540.14(a); § 540.100; Bureau Program Statements 5265.11; 5264.08; 5267.08.

Thus, whether considered an interpretive rule or general statement of policy,[1] the Institution Supplement simply advises the public and staff of the Bureau's construction and implementation of its statutory and regulatory authority to establish the CMU with its attendant (and valid) restrictions. *See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995); *Production Tool v. Employment & Training Admin.*, 688 F.2d 1161, 1161 (1982). It is an internal agency statement of explanation that is consistent with both the Bureau's statutory authority and the regulations it clarifies. *Parson v. Pitzer*, 149 F.3d 734, 738 (7th Cir. 1998). Like a Bureau Program Statement, the Institution Supplement constitutes a statement of policy and rules of Bureau practice and procedure in implementing a discretionary Bureau program. *See Miller v. Henman*, 804 F.2d 421, 424 (7th Cir. 1986); *Production Tool*, 688 F.2d at 1166. In establishing the CMU, the Bureau remains genuinely free to exercise its statutory discretion. *See Texas Sav. & Comty. Bankers Ass'n v. Fed'l Housing Fin. Bd.*, 201 F.3d 551, 556 (5th Cir. 2000) (citations omitted). The Institution Supplement on its face is consistent both with the Bureau's broad statutory discretion and the above-cited regulations governing certain inmate restrictions that apply to inmates assigned to the CMU and to inmates in the general population. *See Parsons*, 149 F.3d at 738.

Put another way, the substance of the Institution Supplement "flows fairly from the substance" of the Bureau's statutory authority and the relevant regulations. *See Cent. Texas Tel. Coop. v. FCC*, 402 F.3d 205, 212 (D.C. Cir. 2005). Even the American Civil Liberties Union, in criticizing the Bureau's subsequently withdrawn proposed CMU rule, conceded that the

---

[1] Courts often treat the two terms interchangeably. *But see Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94-95 (D.C. Cir. 1997). For the reasons given, the Institution Supplement qualifies as either, and certainly is not a legislative rule under any formulation.

substance of the CMU's restrictions on inmates is permitted by existing Bureau regulations. (Am. Compl. Ex. F at 6-7.)

The Institution Supplement is therefore not a legislative rule, for it does not purport to have the force of law, or to bind the courts in the manner of congressional enactments. *See MSD of Wayne Twsp. v. Davila*, 969 F.2d 485, 492 (7th Cir. 1992). It does not seek to bind or limit the Bureau's statutory discretion, or bind the Bureau to a particular policy position. *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1111 (D.C. Cir. 1993). Nor is it "irreconcilable" with the Bureau's statutory authority or any duly promulgated regulations concerning inmate restrictions. *Id.* at 1109. In sum, the Institution Supplement has none of the hallmarks that courts have found indicative of a legislative rule. It therefore constitutes a non-legislative rule or general policy statement that is exempt from the APA's notice and comment requirement. *See* 5 U.S.C. § 553(b).

In arguing the contrary, Benkahla misconstrues the applicable legal standards for divining the line between legislative rules and the sorts of agency pronouncements that require no notice or comment under the APA. For example, Benkahla claims that the Institution Supplement cannot be an interpretive rule if it does not cite or quote from legislative history, statutes, regulations, or caselaw—characteristics that, Benkahla argues, indicate "cloistered, appellate-court type reasoning." In essence, Benkahla contends that an agency's rule cannot be interpretive unless it is in the nature of a detailed judicial opinion or law review article.

But relevant caselaw makes clear that it is the substance of an agency's rule, and not any particular form, that is ultimately determinative of whether the rule is interpretive or legislative. *See Gen'l Elec. Co. v. E.P.A.*, 290 F.3d 377, 382 (D.C. Cir. 2002) ("[T]he ultimate focus of the

5

inquiry is whether the agency action partakes of the fundamental characteristic of a regulation, *i.e.*, that it has the force of law.") (internal quotation marks and citation omitted); *see also Dismas Charities, Inc. v. U.S. Dept. of Justice*, 401 F.3d 666, 679-80 (6th Cir. 2005).  A court must determine if the substance of an agency's proffered interpretive rule flows fairly from the statutory authority from which it derives.  *See Cent. Texas Tel. Coop.*, 402 F.3d at 212; *see also id.* at 214 ("[A]n intepretive rule does not have to parrot statutory or regulatory language. . . ."); *cf. Fertilizer Inst. v. U.S. E.P.A.*, 935 F.2d 1303, 1308 (D.C. Cir. 1991) (rejecting argument that agency's rule must "specifically discuss the language, purpose and legislative history" of a statute in order to be interpretive).

  While an interpretive rule must derive from a process of reasoning, neither the APA nor relevant caselaw require demonstration of that reasoning by some quantum of citation or quotation as Benkahla urges.  At most, inclusion of such citation is merely one factor of a court's analysis of the question, and not the only (and certainly not the dispositive) such factor.  *See, e.g.*, *Novelty, Inc. v. Tandy*, 2008 WL 3835655, at *12 (S.D. Ind. Aug. 7, 2008) (stating that a rule's "reference to sources" is one of "several factors for a court to consider to determine whether a rule is legislative or interpretive").  Thus, the Institution Supplement is not a legislative rule simply because it does not contain some minimal number or type of legal citations.  Rather, it must be shown that the substance of the Institution Supplement does not flow fairly from the Bureau's statutory authority.

  Benkahla has not (and cannot) make such a showing.  As explained, the Institution Supplement derives from and is consistent with the Bureau's broad statutory authority to manage the federal prisons.  Furthermore, the principal restrictions on inmates in the CMU that Benkahla

challenges (phone calls, visitation, and mail) are consistent with existing, duly promulgated regulations and Bureau program statements. *See Gunderson v. Hood*, 268 F.3d 1149, 1154 (9th Cir. 2001) (holding that a Bureau program statement was a valid interpretive rule because it was "not inconsistent" with existing regulation). The substance of the Institution Supplement flows fairly from the Bureau's statutory authority and implementing regulations, and a court can readily determine the interpretive nature of the supplement without it parroting statutory or regulatory language or providing abundant legal citations.

Benkahla's cited caselaw does not support the opposite conclusion. The principal concern of the court in *Hoctor v. U.S. Department of Agriculture*, for example, was not that the challenged rule lacked some quantum of citation, but that the agency's rule appeared to be an *arbitrary* choice (requiring a fence of a certain height) without any reasoned link between the agency's choice and the regulation providing the authority for the rule. 82 F.3d 165, 170-71 (7th Cir. 1996) ("When agencies base rules on arbitrary choices, they are legislating. . . ."). In other words, the arbitrary choice made by the agency did not readily flow from the substance of its regulatory authority. *See id.* at 170 ("A rule that turns on a number is likely to be arbitrary . . . ."). Without some indication of how the agency made a reasoned choice under its regulatory authority to reach its conclusion as to a particular height of fence, the court concluded that the rule could not be interpretive. *See id.* at 171 (noting that the arbitrariness of the selection of a required fence height represented no reasoning by which the agency could have "excogitated" the rule from the regulation in question).

But there is nothing arbitrary about the Bureau's creation of the CMU or its attendant restrictions, which (as the ACLU explicitly recognized) are already authorized by duly

promulgated regulations and various Bureau program statements.  Benhahla's contention places form over substance and must be rejected.

Benkahla also bemoans what he claims to be the binding or mandatory nature of the Institution Supplement.[2]  He asserts that no law *required* the Bureau to make its discretionary choice to establish the CMU, and the Institution Supplement therefore must be a legislative rule.  Again, Benkahla has it wrong.

The Bureau did not establish the CMU because it believed it was required to do so under the Attorney General's statutory discretion.  Rather, it established the CMU in the very exercise of that discretion.  Courts have recognized that the apparently mandatory nature of an agency's rule may make the rule legislative if the agency intends to create binding law or if the agency is not free to exercise its discretion.  *See Miller v. Henman*, 804 F.2d 421, 424 (7th Cir. 1986) (instructing that if the Attorney General seeks "to restrict his statutory discretion" with respect to administration of the prisons, he must bind himself with enforceable rules in accordance with the APA); *see also Texas Savings*, 201 F.3d at 556.  The Institution Supplement does not purport to establish binding law, nor does it limit or eliminate (or expand, for that matter) the Attorney General's statutory authority or discretion.  The Institution Supplement at issue simply identifies an additional housing choice that is available for the placement of inmates within the exercise of the Bureau's legitimate discretion in managing and administering its inmate population.

---

[2] Benkahla contends that the Bureau has conceded that the establishment of the CMU originated *sui generis*, solely as a matter of Bureau whim, without any derivation from statutory authority. (Opp. Br. at 13.)  The Bureau made no such concession, and could not do so as its authority for administration and management of the prisons—including assignment and classification of inmates—specifically derives from the Attorney General's specific statutory authority.  As explained, the establishment of the CMU was reasoned and derivative of the specific statutory provisions cited in this reply and the Bureau's opening brief.

And, contrary to Benkahla's assertion, the Bureau's discretionary choice among methods of implementation does not render the Institution Supplement a legislative rule, for that choice was not arbitrary. Rather, it was derivative of (and consistent with) the Bureau's statutory and regulatory authority. The Bureau's establishment of the CMU is therefore not "binding" in the sense that it somehow limits or eliminates the Attorney General's statutory discretion. *See Miller*, 804 F.2d at 424 ("[I]f all the Attorney General has done is to tell his staff how he wants to exercise discretion—language that brings his subordinates' acts in line with his wishes but does not reduce his discretion to do otherwise—then there is no substantive [or legislative] rule enforceable in any forum."). As explained, if anything, the Institution Supplement is a manifestation of the Bureau's statutory discretion.

But even if the Institution Supplement is considered "binding" (*i.e.*, mandatory) as to the Bureau or Benkahla, that, too, does not render the rule legislative. *See Davila*, 969 F.2d at 493 ("All rules which interpret the underlying statute must be binding because they set forth what the agency believes is congressional intent. . . . Courts are not bound by an agency's interpretation, . . . but parties regulated by the statute certainly are."). The Institution Supplement, to the extent it may be considered binding, does not restrict the Bureau's discretion to create, administer, or even dissolve the CMU.

For all of these reasons, the Attorney General did not interpret any statutory authority as *requiring* the establishment of the CMU. Instead, the Attorney General (through the Bureau leadership) merely exercised his statutory *discretion* to create the CMU and issued implementing instructions via the Institution Supplement to Bureau staff. *See Miller*, 804 F.2d at 424 ("The Attorney General possesses statutory discretion to [assign inmates] where he will, but because

9

the Attorney General does not act on his own behalf he must tell his subordinates what to do."). That these implementing instructions—which "establish[] guidelines and procedures" (Am. Compl. Ex. B at 1)—are couched in mandatory terms for Bureau staff and inmates like Benkahla hardly transforms the Institution Supplement into a legislative rule. *See Miller*, 804 F.2d at 424; *cf. Dismas Charities*, 401 F.3d at 681 (noting that the binding nature of an interpreted statute "cannot render a rule legislative, else every interpretive rule would become legislative"). Nor would it matter if the Bureau had established the CMU based on a revised interpretation of its statutory authority. *See MSD of Wayne Twsp.*, 969 F.2d at 490.

Likewise, Benkahla is wrong that the Institution Supplement is a legislative rule because it somehow represents something more than a "tentative" statement of the agency's view or intentions for the future. (Opp. Br. at 18.) Because the Institution Supplement does not restrict the Attorney General in the exercise of his statutory discretion, the establishment of the CMU is by definition tentative. To the extent the Institution Supplement reflects a "decision already made to establish the CMU" (*id.* at 19), that decision was made in accordance with the Attorney General's broad statutory authority. The Attorney General could, in his discretion, eliminate the Terre Haute CMU tomorrow, just as he can establish additional CMUs in other federal prisons. The Attorney General (and, therefore, the Bureau) remains free to exercise that discretion; the Institution Supplement is therefore not a legislative rule.

### B. The Institution Supplement Does Not Conflict with Existing Regulations

Benkahla is quick to dismiss as "makeweight" the Bureau's characterization of the Institution Supplement as an interpretive rule or general statement of policy. (Opp. Br. at 10.) But Benkahla, paradoxically, ascribes great weight to the Bureau's numerical designation of the

Institution Supplement in his attempt to manufacture inconsistencies between the CMU rules and the rules governing administrative detention or disciplinary segregation. (*Id.* at 22-23.) This argument, too, is unavailing.

The Bureau's choice of numbering alone does not indicate any inconsistency with, or revision of, existing regulations requiring notice and comment. More important, the substance of the Institution Supplement makes clear that, while inmates assigned to the CMU may share certain restrictions with those placed in administrative detention or disciplinary segregation, the three types of assignment are all separate and distinct. The Institution Supplement has no relevance to non-CMU inmates otherwise subject to the Bureau's rules regarding administrative detention or disciplinary segregation. CMU inmates remain subject to administrative detention or disciplinary segregation, albeit within the CMU itself. (Am. Compl. Ex. B, ¶ 1.) Thus, the Institution Supplement does not contradict or revise the other regulations as Benkahla contends. Furthermore, as explained, the CMU's restrictions are in any event consistent with existing regulations and program statements regarding the various restrictions of which Benkahla complains: correspondence, visitation, and telephone use.

Benkahla also places great significance on several Bureau communications to him that contained in the subject line the phrase "control unit placement." (Opp. Br. at 22; Am. Compl. ¶ 98.) Again, Benkahla strains to find an inconsistency where none exists. Benkahla referred vaguely in his administrative remedy complaints that he was challenging his placement in a "control management unit," so it is not surprising that a Bureau intake clerk may have keyed in "control unit placement" in an attempt to classify the administrative remedy challenge. (*See* Am. Compl. Ex. W.) An Intake Clerk has limited space in the computer summary of administrative

11

remedies to identify the nature of the complaint, and often will use the inmate's characterizations of the complaint in completing that task. A stray clerical designation does not qualify as some admission on the part of the Attorney General that the CMU is a control unit such that the Institution Supplement revises, modifies, or contradicts promulgated rules or program statements relating to control units.

Moreover, control unit placement (like placement in administrative detention and disciplinary segregation) involves its own distinct set of criteria and is governed by different rules. The stated purpose of control unit placement is to provide for designation "into a separate unit those inmates who are unable to function in a less restrictive environment without being a threat to others or to the orderly operation of the institution." 28 C.F.R. § 541.40; Program Statement 5212.07. The stated purpose of the CMU, as set forth in the Institution Supplement, is "to house inmates who, due to their current offense of conviction, offense conduct, or other verified information, require increased monitoring of communication between inmates and persons in the community in order to protect the safety, security, and orderly operation of Bureau facilities and protect the public." If anything, inmates subject to control unit placement have even greater restrictions than inmates in the CMU, and assignment is determined by completely different criteria—notwithstanding Benkahla's assertion that the CMU meets the general regulatory definition of a control unit. *See* Program Statement 5212.07.

No doubt Benkahla would dismiss the Bureau's explanation of these obvious, substantive differences as mere "makeweight," but it would be a strange argument indeed that an agency's good faith articulation of purpose or rule characterization should be entitled to virtually no weight, while a vague subject line entry, or choice of numbering for the Institution Supplement,

should be an admission that the Bureau sought to modify or revise duly promulgated regulations. Obviously, this is not the case, and the Institution Supplement does not effect inconsistencies with Bureau rules regarding control units.

## II.     Even if Benkahla's APA Challenge Is Justiciable, It Will Likely Be Moot

As the Bureau noted in its second motion for enlargement of time, on December 22, 2009, the Attorney General recently approved a new regulation that describes CMUs.  Within that proposed rule, CMUs are designed to provide an inmate housing unit environment that enables staff monitoring of all communication between CMU inmates and persons in the community.  The proposed regulation was submitted to the Office of Management and Budget ("OMB") for fiscal impact review, and that review is the last step before publication of the proposed rule in the Federal Register for public review and comment.  OMB has ninety days to complete its fiscal review.  Thus, publication of this rulemaking, which likely will occur in the short term, may well moot this litigation.  *Cf. Hemp Indus. Ass'n v. Drug Enforcement Admin.*, 333 F.3d 1082, 1092 (9th Cir. 2003) (Kozinski, J., dissenting) (noting that a newly promulgated regulation would "eradicate[] the effects of the interpretive rule" and therefore moot any controversy surrounding the rule).

While the Bureau has exercised its discretion to initiate the process for the publication of a proposed rule regarding the CMU, this decision in no way invalidates the arguments presented in the Bureau's opening brief or this reply.  The existing Institution Supplement remains a valid interpretive rule or general statement of policy exempt from APA rulemaking requirements.  As the Seventh Circuit has recognized, nothing in the APA "forbid[s] an agency to use the notice

and comment procedure in cases in which it is not *required* to do so."[3]  *Hoctor*, 82 F.3d at 171-72.

      WHEREFORE, Defendant Federal Bureau of Prisons respectfully requests that the Court dismiss Benkahla's complaint in its entirety.

                                      Respectfully submitted,

                                      TIMOTHY M. MORRISON
                                      United States Attorney


By:    */s/ Thomas E. Kieper*
                    Thomas E. Kieper
                    William L. McCoskey
                    Assistant United States Attorneys

---

[3] For this reason, Benkahla's suggestion that it was problematic for the Bureau to withdraw its earlier proposed CMU rule is similarly meritless.

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2010, a copy of the foregoing **REPLY IN SUPPORT OF MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

>David M. Shapiro
>dshapiro@npp-aclu.org
>
>Kenneth J. Falk
>kfalk@aclu-in.org

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

>NONE.

/s/ *Thomas E. Kieper*
  Thomas E. Kieper
  Assistant United States Attorney

Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, IN 46204
(317) 226-6333
(317) 226-5027 [Fax]